# No. 26-50396

# In the United States Court of Appeals for the Fifth Circuit

**United States of America,**

Plaintiff-Appellant,

v.

**James Wesley Burger,**

Defendant-Appellee.

On Appeal from the United States District Court
for the Western District of Texas

## APPELLANT'S BRIEF FOR THE UNITED STATES

Justin R. Simmons
United States Attorney

Zachary C. Richter
Mark T. Roomberg
Assistant United States Attorneys
Western District of Texas
903 San Jacinto Blvd., Suite 334
Austin, Texas 78701
(512) 916-5858

## Recommendation on Oral Argument

The government requests oral argument. This is a government appeal from pretrial orders striking portions of an indictment and excluding exhibits from trial. ROA.702-05. Oral argument would assist this Court in understanding the importance of the findings struck from the indictment and the excluded evidence.

## Table of Contents

Recommendation on Oral Argument ....................2

Table of Contents ....................3

Table of Authorities ....................6

Introduction ....................10

Jurisdiction ....................11

Statement of the Issues ....................11

Statement of the Case ....................12

I. Across multiple platforms, Burger announced his readiness to perpetrate a violent attack. ....................12

A. In the months leading to the threats charged in the indictment, Burger announced his intent to kill police officers, discussed attacking "Crusaders" and Jews, and expressed support for ISIS. ....................13

B. Burger issued three threats later charged as federal crimes. ....................16

1. Burger threatened to kill authorities who tried to arrest him. ....................16

2. Two days later, Burger threatened to strike a "glorious" and "grevious [sic] wound upon the followers of the Cross" at a Christian concert. ....................17

3. Four days later, Burger announced that he would strike a "grevious wound upon the followers of the Cross" at a "music festival." ....................19

C. After issuing the charged threats, and even after his arrest, Burger continued to signal his readiness to perpetrate an attack. ....................21

II. A federal grand jury indicted Burger for issuing threats interstate, and this Court reversed the district court's dismissal of the indictment and held that a jury should consider the charges at trial. ........ 24

III. On remand, the district court struck portions of the indictment and excluded most of the government's exhibits from the jury's consideration. ........ 26

Summary of the Argument ........ 32

Argument ........ 33

I. The district court abused its discretion in striking as surplusage portions of the indictment alleging Burger's motive. ........ 35

A. Standard of review: abuse of discretion. ........ 35

B. The district court abused its discretion by failing to apply the strict legal standard for striking allegations from an indictment. ........ 36

C. At a minimum, this Court should vacate the order striking the special findings because the district court failed to explain it. ........ 38

II. The district court abused its discretion when it excluded from trial nearly every exhibit reflecting Burger's statements and actions before and after the statements specifically charged as threats. ........ 39

A. Standard of review: abuse of discretion. ........ 41

B. The district court abused its discretion by excluding evidence based on its misunderstanding of the law distinguishing intrinsic evidence from extrinsic evidence. ........ 41

C. The district court abused its discretion by excluding evidence based on its misunderstanding of the law on true threats and its clearly incorrect assessment of the evidence. ....................45

1. The district court misunderstood the law of true threats and clearly erred in assessing the relevance of the challenged exhibits. ....................45

2. If the district court meant to exclude the challenged evidence as more prejudicial than probative, it clearly erred in assessing the need for and probative value of the evidence. ....................49

Conclusion ....................52

Certificate of Service ....................53

Certificate of Compliance ....................53

# Table of Authorities

**Cases**

*Bailey v. Iles*,
87 F.4th 275 (5th Cir. 2023) .......... 34

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... passim

*Huddleston v. United States*,
485 U.S. 681 (1988) .......... 40

*Klier v. Elf Atochem N. Am., Inc.*,
658 F.3d 468 (5th Cir. 2011) .......... 36

*United States v. Beeman*,
135 F.4th 139 (4th Cir.) .......... 44

*United States v. Bergrin*,
682 F.3d 261 (3d Cir. 2012) .......... 49

*United States v. Bullock*,
451 F.2d 884 (5th Cir. 1971) .......... 35

*United States v. Burger*,
170 F.4th 395, 401-06 (5th Cir. 2026) .......... passim

*United States v. Carpenter*,
140 F.4th 733 (5th Cir. 2025) .......... 41, 42, 44

*United States v. Censke*,
449 F. App'x 456 (6th Cir. 2011) .......... 44

*United States v. Dysart*,
705 F.2d 1247 (10th Cir. 1983) .......... 47

*United States v. Elonis*,
841 F.3d 589 (3d Cir. 2016) .......... 47

*United States v. Gardner*,
No. 20-50481, 2022 WL 422167 (5th Cir. Feb. 11, 2022) .......... 38, 39

*United States v. Gluk*,
831 F.3d 608 (5th Cir. 2016) .......... 49

*United States v. Graves*,
5 F.3d 1546 (5th Cir. 1993) .......... 36

*United States v. Gurrola*,
898 F.3d 524 (5th Cir. 2018) ........................................................42, 43

*United States v. Hall*,
583 F.2d 1288 (5th Cir. 1978).........................................................47

*United States v. Handlon*,
53 F.4th 348 (5th Cir. 2022) ...........................................................38

*United States v. Jackson*,
339 F.3d 349 (5th Cir. 2003) ..........................................................41

*United States v. Jiang*,
No. 1:24cr65, 2025 WL 419531 (E.D. Va. Feb. 6, 2025).....................37

*United States v. Juarez*,
866 F.3d 622 (5th Cir. 2017) ........................................................50, 51

*United States v. Jubert*,
139 F.4th 484 (5th Cir. 2025) ............................................... 26, 33, 34

*United States v. Kinchen*,
729 F.3d 466 (5th Cir. 2013) ........................................................45, 50

*United States v. Martinez*,
921 F.3d 452 (5th Cir. 2019) ..........................................................52

*United States v. Miah*,
120 F.4th 99 (3d Cir. 2024) ................................................. 34, 47, 48

*United States v. Parr*,
545 F.3d 491 (7th Cir. 2008) ................................................ 34, 46, 48

*United States v. Portillo*,
969 F.3d 144 (5th Cir. 2020) ..........................................................49

*United States v. Ricard*,
922 F.3d 639 (5th Cir. 2019) ........................................................45, 50

*United States v. Rider*,
94 F.4th 445 (5th Cir. 2024) ...........................................................49

*United States v. Siegel*,
536 F.3d 306 (4th Cir. 2008) ..........................................................49

*United States v. Solomon*,
273 F.3d 1108, 2001 WL 1131955 (5th Cir. 2001) .......................35, 36

*United States v. Springer*,
753 F. App'x 821 (11th Cir. 2018) .......................................... 44, 47, 51

*United States v. Taubert*,
810 F. App'x 41 (2d Cir. 2020) .......................................................37

*United States v. Viefhaus*,
168 F.3d 392 (10th Cir. 1999) .........................................................48

*United States v. Williams*,
30 F.4th 263 (5th Cir. 2022) ...........................................................51

*Virginia v. Black*,
538 U.S. 343 (2003) ........................................................................24

**Statutes**

18 U.S.C. § 875 ........................................................................ 10, 33

18 U.S.C. § 3231 ...............................................................................11

18 U.S.C. § 3731 ...............................................................................11

Violent Crime Control & Law Enforcement Act of 1994,
Pub. L. 103-322, 108 Stat. 1796 ......................................................37

**Rules**

Fed. R. App. P. 32 ............................................................................53

Fed. R. Crim. P. 12 ...........................................................................24

Fed. R. Crim. P. 7 ........................................................................27, 35

Fed. R. Evid. 403 ..............................................................................49

Fed. R. Evid. 404 ........................................................................passim

Fed. R. Evid. 801 ..............................................................................51

**U.S. Sentencing Guidelines**

3A1.1 ........................................................................... 27, 37, 50

**Other**

*Cookie*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/cookie (last visited Aug. 10, 2026) ..............20

*Discord*, Encyclopedia Britannica, https://www.britannica.com/topic/Discord (last visited Aug. 10, 2026)........................................................................................14

*FBI releases timeline of suspect Shamsud-Dim Jabbar's New Orleans attack*, ABC News (Jan. 5, 2025), https://abcnews.com/US/fbi-releases-timeline-suspect-shamsud-dim-jabbars-new/story?id=117280639......15

*Sri Lanka Attacks: Easter Sunday bombings marked one year on*, BBC (Apr. 21, 2020), https://www.bbc.com/news/world-asia-52357200. ..........................................................................................21

*Who was Abu Bakr al-Baghdadi?* BBC (Oct. 28, 2019), available at https://www.bbc.com/news/world-middle-east-50200392................14

## Introduction

As part of a larger pattern of online posts expressing support for ISIS and antipathy toward Christians and law enforcement, Defendant-Appellee James Wesley Burger announced his intent to martyr himself in violent attacks, including by attacking a Christian music festival. A federal grand jury charged three of those announcements as violations of 18 U.S.C. § 875(c), which prohibits issuing threats interstate. But the district court, agreeing with Burger's contention that he was "playing a game," dismissed the indictment.

This Court reversed and remanded for a jury trial. *United States v. Burger*, 170 F.4th 395, 401-06 (5th Cir. 2026). This Court stressed that "context is critical" in understanding whether statements are criminal threats. *Id.* at 402. Trial was necessary to resolve whether the context surrounding Burger's statements showed that he was playing a game, as he claimed, or issuing criminal threats. *Id.* at 406.

On remand, the district court failed to heed this Court's instruction to consider context. It struck from the indictment the grand jury's findings that Burger intentionally selected a Christian concert as the object of his threats because of religion. And it excluded from trial virtually all evidence establishing the context for Burger's threats. To ensure that the trial jury can understand the context surrounding Burger's threats, this Court should reverse or vacate those decisions and remand.

## Jurisdiction

The government appeals from the district court's orders of May 11 and 12, 2026, striking a portion of the Second Superseding Indictment against Burger and excluding most of the government's trial exhibits. ROA.702-03, 1057-1101, 1104-05. The district court had jurisdiction under 18 U.S.C. § 3231. The government filed a timely notice of appeal from those orders on May 13, 2026. ROA.704-05, 717-18. This Court has jurisdiction under 18 U.S.C. § 3731. The Solicitor General has authorized this appeal.

## Statement of the Issues

**1.** A court should not strike allegations in an indictment as surplusage if those allegations are relevant to the offense. The indictment included the grand jury's findings about Burger's motive for his offense—that he intentionally selected a Christian concert as the object of his threats because of religion. The district court struck those findings as surplusage. Did the district court abuse its discretion?

**2.** Before trial, the district court excluded nearly every government exhibit reflecting Burger's statements before and after the charged threats, his statements on every online platform but the one he used to issue the charged threats, and his offline preparation for an attack. Did the district court abuse its discretion by excluding these exhibits from trial?

## Statement of the Case

A grand jury charged Burger with violating 18 U.S.C. § 875(c) by transmitting threats to injure another person after he threatened to "deal" a "grevious [sic] wound upon the followers of the Cross" at a "music festival . . . [a]ttracting bounties of Christians." ROA.1494, 1512. The district court dismissed that indictment. ROA.465, 977. The government appealed, and this Court reversed and remanded. *Burger*, 170 F.4th at 401, 406. This Court held that the district court "improperly resolved disputed questions of fact . . . on an incomplete record" when it dismissed the indictment. *Id.* at 401. A jury trial was necessary. *Id.* at 406. On remand, the district court struck allegations from the second superseding indictment and excluded most of the government's trial exhibits. ROA.702-03. The government appeals from those orders. ROA.704, 717.

### I. Across multiple platforms, Burger announced his readiness to perpetrate a violent attack.

Burger was a high school senior living with his aunt and uncle in a suburb of Austin, Texas, when he began expressing support for the Islamic State, an interest in explosives and firearms, and antipathy toward Jews, Christians, and law enforcement. ROA.797, 857, 1413, 1416-19, 1448-49, 1493. As his counsel later conceded, Burger "started doing this online radicalization" that "brainwashed" him. ROA.906. Burger's uncle saw a change in his behavior and noticed when Burger received a black flag with Arabic lettering in the mail. ROA.819, 1015, 1074, 1406.

Alarmed, Burger's uncle removed guns from the house and installed a keylogger on the family computer. ROA.819-20, 824, 1015-16.

### A. In the months leading to the threats charged in the indictment, Burger announced his intent to kill police officers, discussed attacking "Crusaders" and Jews, and expressed support for ISIS.

In July 2024, the keylogger captured Burger typing in an online platform called Roblox. 678, 821-22, 1074, 1413. Roblox is "a popular online gaming platform and game-creation system" in which users populate "experiences"—"games, virtual worlds, and social spaces"—through customized avatars. *Burger*, 170 F.4th at 397; *see* ROA.810-11. Within an "experience," users can chat through texts temporarily visible to other users. *See Burger*, 170 F.4th at 397. Burger typed in Roblox:

> I think the Austin Police Department
> Would be a good target
> Cuz I hate
> The police so much
> I hate all constitutions and government
> Outside of the Sharia
> And all laws outside of Sharia
> All man-made law is illegitimate
> . . .
> But yah I would
> Definitely kill a lot of cops someday
> I have a handgun and a couple of rifles and a shotgun at my house
> And I'm gonna buy an AR off someone I know lol
> . . .

> Lol the US Law Enforcement apparatus . . . do[es] not take reports or concerns forwarded by Roblox seriously . . .
>
> . . .
>
> It is not that hard to
> Ambush a police cruiser
>
> . . .
>
> Like literally in NY two weeks ago, a cop got shot at point blank in his cruiser lol[.]

ROA.678, 821-22, 1074, 1413.

The same month, Burger used Discord, a social-media platform that allows users to chat in real time. ROA.681-82, 1088-89, 1448-49.[1] In a chat, Burger "pledge[d] allegiance to Abu Bakr al Baghdadi[2] of the Islamic State." ROA.681-82, 1088-90, 1448-49. Around the same time, Burger's uncle confronted him about his online statements and told Burger that he found those statements alarming. ROA.1015-16.

About five months later, in December 2024, Burger sent through Discord a series of images promoting ISIS, depicting the demolition of a Christian cross, and concluding, "Didn't we promise that we'll come to you?" ROA.1090-91, 1450-68. Later that month, in a different online messaging platform called Telegram, Burger said that "[t]here's no better death" than dying a "Shaheed [martyr]." ROA.1005, 1488-89.

---

[1] *Discord*, Encyclopedia Britannica, https://www.britannica.com/topic/Discord (last visited Aug. 10, 2026).

[2] Abu Bakr al-Baghdadi was the leader of the Islamic State. *Who was Abu Bakr al-Baghdadi?* BBC (Oct. 28, 2019), available at https://www.bbc.com/news/world-middle-east-50200392.

The next month, on January 16, 2025, Burger typed in Roblox,

> O Jews of evil, be patient . . . The punishment is due upon you! killing you is a new glory! killing you is a new celebration
>
> . . .
>
> Wherever Jews or their servants settle, they spread corruption and terror throughout the lands
>
> . . .
>
> Their blood is permissible
>
> to us
>
> their blood and the blood of the Crusaders is halal to us[.]

ROA.1493. Three days later, on January 19, 2025, Burger typed,

> I live in America and by Allah's grace things are soon to come [] And that is
>
> a blessing
>
> What is better than to be a munasir[3]
>
> Among the pigs
>
> Of disbelief . . .
>
> No, it's a blessing because
>
> There's no need to leave to Iraq
>
> . . . When I can slay you here
>
> In your own lands

ROA.1493.

Then, after listing a string of ISIS attacks, Burger typed,

> Nobody cares about new orleans[4]

---

[3] The government anticipates being able to provide testimony that "munasir" means "fighter" or "militant."

[4] Eighteen days earlier, on January 1, 2025, a man who had proclaimed his support for ISIS had killed 14 people in an attack in New Orleans. Leah Sarnoff, *FBI releases timeline of suspect Shamsud-Dim Jabbar's New Orleans attack*, ABC News (Jan. 5, 2025),

> . . .
> [Y]ou're an enemy of Allah and your blood is halal
> And your head should be taken off
> From the neck[.]

ROA.1493.

### B. Burger issued three threats later charged as federal crimes.

Two days later, Burger began making the statements later charged as criminal threats. ROA.42-43, 66-68, 611-13, 1494, 1509-16, 1517-26. He issued the statements within a Roblox experience called "Church." ROA.811, 1014. "Church" was not a game, but a chat room. ROA.1014. Avatars "entered a structure styled as a virtual church" where they "communicated with other users" and "argued with each other." *Burger*, 170 F.4th at 397.

#### 1. Burger threatened to kill authorities who tried to arrest him.

Burger made the first statement on January 21, 2025, using an avatar named "Ghurabaah." ROA.613, 1517-26. After discussing donating to "the Mujahidin," Burger announced:

> Yes I have guns
> Incase the authorities
> Want to arrest me

ROA.1518, 1522. When another avatar asked, "[W]hat are you gonna do if they try?" Burger responded:

> I am ready

https://abcnews.com/US/fbi-releases-timeline-suspect-shamsud-dim-jabbars-new/story?id=117280639.

To sacrifice my life
For my Rabb[5]
Detonate what I've prepared
Of munitions
And use my firearms
To take many with me
Yes wish me luck
On the path of martyrdom
In'shaa'allah[.][6]

ROA.1523-26. A witness in Pennsylvania, raised a Muslim and experienced in using Roblox, saw this statement, believed it to be a threat—not "trolling" (deliberate provocation) or role-playing—and reported it to the FBI. ROA.361.

**2. Two days later, Burger threatened to strike a "glorious" and "grevious [sic] wound upon the followers of the Cross" at a Christian concert.**

Two days later, on January 23, 2025, Burger issued the second statement later charged as a threat. This time, Burger used the avatar "Crazz3pain" in a conversation with the avatar "xandersrange," who turned out to be a user in Saudi Arabia. ROA.611, 1013, 1068, 1396-1400, 1509-16. When xandersrange asked, "[H]ow many days until you do tha[t]?" Burger responded:

It will be months
Shawwal

[5] "Rabb" is an Arabic term for "God." *Burger*, 170 F.4th at 398 n.3.

[6] "Inshallah" is an Arabic expression meaning "if Allah wills" or "God willing." *Burger*, 170 F.4th at 398 n.4.

> April
> It will be a glorious wound
> Upon their capitol
> And deal a grevious wound upon the followers of the Cross

ROA.1510-12.

Xandersrange responded, "Akhi,[7] we will make dua[8] for u once u martyr," "I[']ll keep you in my prayers," and "InshaAllah [I']ll follow after you." 1512-13. Burger then replied, "I cannot confirm anything aloud at the moment[,] But things are in motion." ROA.1514. When xandersrange user turned to another avatar and said, "ALI MY BROTHER IS ABOUT TO DO HIS ATTACK," Burger responded, "Don't delay yourselves too long brothers, Jannah[9] awaits us." ROA.1515-16.

A witness in Nevada who happened to be a Muslim saw this exchange and "felt the need to call" the FBI about it because Burger "seemed pretty serious about this." Gov't Ex 1C (audio);[10] *see* ROA.833. That witness also reported statements by Burger not captured in screenshots, including that Burger said that he wanted to "humiliate worshippers of the Cross" at a "Christian concert event" when it was "really busy," with "a lot of people in one place," so he could do the "most

---

[7] "Akhi" is an Arabic term meaning "brother." *Burger*, 170 F.4th at 399.

[8] "Make dua" is an Arabic expression referring to prayer. ROA.814.

[9] "Jannah" is an Arabic term for paradise. ROA.815.

[10] The government submitted this audio recording to the district court, which admitted it at the pretrial conference. ROA.1390.

damage." Gov't Ex 1C; *see* ROA.816-17. When the witness tried to get more information about the concert, "xandersrange" advised Burger not to say anything, lest he be reported. Gov't Ex. 1C. Xandersrange also warned Burger to keep his guns hidden and to delete photographs of firearms that Burger had posted on Discord using the name "afrikan3r," lest the platform flag his account. Govt' Ex. 1C.

A later search of Burger's phone uncovered a note from the same day entitled, "An Address to the Followers of the Cross":

> O Kuffar! You are ruthless but we are also ruthless. Did you think we would remain inattentive? Did you believe we would not repay you in your lands upon your terms, as you did whilst you raped the Umma of its glory and honor and subjected it to a state of weakness and humiliation and corruption? Verily, today has brought a great wound upon you and has paralyzed your media and whatever you possess of temporary might and power!

ROA.1061, 1392.[11]

**3. Four days later, Burger announced that he would strike a "grevious wound upon the followers of the Cross" at a "music festival."**

Burger issued the third statement charged as a threat four days later, on January 27, 2025. ROA.612, 1494. On the platform Discord, Burger—using the name "afrikan3r"—chatted with the user "nurullah." ROA.1393-94, 1491. "Nurullah" was another name used by the Saudi Roblox user "xandersrange," who had chatted with Burger when he

[11] The government anticipates being able to provide testimony that "Kuffar" is a term for disbelievers and that "Umma" refers to the global community of Muslims.

announced his plan to attack a Christian concert a few days before. ROA.1396-1400, 1509-16; Gov't Ex. 1C. Burger told the Saudi user, "I think I've come to a conclusion on the when and where." ROA.1393. The Saudi user responded, "Join me[.] I[']m on [R]oblox[.] We will talk there[.]" ROA.1393. Burger agreed. ROA.1394.

Two minutes later, in statements on Roblox captured by the key-stroke logger, Burger typed,

> I've come to conclude it will befall the 12 of Shaw-wal . . .
>
> And it will be a music festival
>
> Attracting bounties of Christians . . .
>
> In'shaa'allah we will attain martyrdom
>
> And deal a grievous wound upon the followers of the Cross
>
> Pray for me and enjoin yourself to martyrdom[.]

ROA.1494. As Burger's January 23 statement clarified, he meant "the 12 of Shawwal" to signify April 12. ROA.1510.

Federal agents discovered that a Christian concert was scheduled for April 12, 2025, in Austin, promoted by the company LiveNation. ROA.1004-05, 1490. A "cookie" later recovered from Burger's phone showed that he had accessed LiveNation's website on January 23, 2025—the day of the second threat. ROA.1483.[12] Burger's phone also

[12] A "cookie" is a small file or part of a file stored on an internet user's computer, created and subsequently read by a website server, and containing information that can include a record of pages visited. *Cookie*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/cookie (last visited Aug. 10, 2026).

contained an (undated) image of LiveNation's logo. ROA.1403. Undated search terms later recovered from Burger's phone showed that he had searched in Google for "festivals happening near me" and "which month is april in Islam." ROA.1407, 1411. He had also searched for "isis lone wolf propaganda"; "are suicide attacks haram[13] in islam"; "kill the disbelievers where you find them quran"; "269 christians killed";[14] and "what is the most effective sharp knife type." ROA.1408-11.

### C. After issuing the charged threats, and even after his arrest, Burger continued to signal his readiness to perpetrate an attack.

Burger continued to announce—in and out of Roblox—his readiness to engage in violence. Four days after the last charged threat, on January 31, 2025, he said on Discord that he had been "doing some good proper rifle training." ROA.1471. Three days later, on February 3, 2025, the keystroke logger captured him typing:

> We're getting our knives sharpened for your throats
> . . .
> Mock us all you want but the spark has been lit
> The spark of your demise
> You're going to kneel[.]

[13] The government anticipates being able to provide testimony that "haram" is an Arabic term meaning "forbidden."

[14] Investigators believe this is a reference to the 2019 Easter terrorist bombing attacks in Sri Lanka that killed 269 people and targeted Catholic churches and luxury hotels. ISIS claimed responsibility for the attacks. *Sri Lanka Attacks: Easter Sunday bombings marked one year on*, BBC (Apr. 21, 2020), https://www.bbc.com/news/world-asia-52357200.

ROA.1414. That day Burger also continued an earlier Roblox chat with a user who had asked about explosives. ROA.1416-17. Burger explained how to "use a battery to remotely detonate [a] mine." ROA.1416-17.

A day later, on February 4, 2025, when asked about dying as a "Shaheed [martyr]" by another user in Roblox, Burger said that he would "sacrifice [him]self in a frenzy 100%" if "it became necessary or [he] felt obligated to." ROA.1005, 1068, 1533. Asked to clarify what he meant by "frenzy," Burger responded:

> In a blaze of iron and metal
> Raining bullets upon disbelievers
> And their soldiers/police[.]

ROA.1534-35.

He also said that he would "[o]ne hundred percent" consider joining the Islamic State and that he "train[ed] already . . . [w]ith weapons." ROA.1537-40, 1557. He "use[d] pistols and 'sniper' rifles mostly"—that is, a "high-end hunting rif[l]e"—because "[h]aving big guns is an easy way to FBI city." ROA.1558-62. Less than a week later, Burger announced through the avatar "FollowerofTawhid" that he "want[ed] to do a stabbing attack" targeting "[a]uthorities, Christians, any disbelievers." ROA.1391, 1492, 1569-70.

Later that month, the FBI executed a federal search warrant at the house where Burger lived. ROA.20, 819. Agents found Burger there and

conducted a lengthy interview. ROA.824, 845.[15] After the interview, state authorities arrested Burger on state charges. ROA.860. Federal authorities also searched Burger's phone. ROA.841. It included pictures of him posing with a rifle, holding a handgun to another person's cheek, and posing like an ISIS fighter depicted in another image found on the computer he used. ROA.1401-02, 1404, 1431.

About three months later, in May 2025, Burger was transferred to federal custody on a federal complaint. ROA.16, 829. During this transfer, authorities discovered that Burger had handwritten notes that included plans to make a bomb. ROA.416, 829-31, 1420-21. Burger later claimed that he had copied the bombmaking plans from a novel, but an FBI expert confirmed that they could result in an operational explosive device. ROA.416, 1425-30. The notes also included a list of terrorist attacks and a list of phone contacts that corresponded to contacts in his phone. ROA.831-32, 1017, 1420, 1423. The list of terrorist attacks ended with the notations "#JeSuisEtatIslamique" and "#JeSuisISIS"—"I am ISIS." ROA.832, 1423.

---

[15] The interview lasted between 11 and 12 hours. ROA.77. Burger moved to suppress statements he made during the interview, which he argued was custodial, because the agents did not give him *Miranda* warnings. ROA.77. The government elected not to offer Burger's statements during its case-in-chief but reserved the right to use the statements in cross-examination if Burger testified. ROA.375, 883-85.

## II. A federal grand jury indicted Burger for issuing threats interstate, and this Court reversed the district court's dismissal of the indictment and held that a jury should consider the charges at trial.

A federal grand jury charged Burger with two counts of violating 18 U.S.C. § 875(c), which prohibits "transmit[ting] in interstate or foreign commerce any communication containing . . . any threat to injure the person of another." ROA.42-43. Count One covered Burger's statements on January 23, 2025, and Count Two covered Burger's statements on January 27, 2025. ROA.42-43. In a superseding indictment, another grand jury added Count Three, which covered Burger's statements on January 21, 2025. ROA.66-68.

Burger moved to dismiss the indictment pretrial under Federal Rule of Criminal Procedure 12. ROA.321-43. He argued that the indictment sought to punish him for speech protected by the First Amendment. ROA.321. And he portrayed his statements in Roblox as "fantasy role playing"—"role playing as a terrorist" in "a fantasy world." ROA.893, 899. The government responded that the First Amendment did not protect Burger's statements because they were true threats—that is, "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence,'" *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). ROA.364-69.

At a hearing on the motion, the district court (Albright, J.) announced, "If I were on the jury, I would acquit him." ROA.903. The court orally dismissed the indictment and released Burger from pretrial

detention. ROA.977. Two days after its oral order, the district court issued a written dismissal order that offered no reasoning but said a memorandum would be "forthcoming." ROA.465. Meanwhile, Burger was released unconditionally. *Burger*, 170 F.4th at 400.

The government immediately appealed. ROA.466. On the government's emergency motion, this Court stayed the dismissal and release orders and directed the district court to provide its reasons for dismissal and release within ten days. *Burger*, 170 F.4th at 400. Ten days later, the district court explained its view that Burger's statements were not true threats because of their "lack of specificity and the role-playing context in which [they were] made." ROA.498-500. Burger, the district court opined, was "playing an *online video game*, speaking as a *character*, among other *players* who were similarly acting as *characters* . . . in a fictional game understood as such by all participants." ROA.497 (emphasis in original).[16]

This Court reversed and remanded. *Burger*, 170 F.4th at 401-06. This Court held that the district court had improperly resolved disputed questions of fact in deciding a Rule 12 motion to dismiss. *Id.* at 401. The district court improperly resolved disputed factual questions about whether

[16] After receiving the district court's explanation, this Court extended its stay of the dismissal and release orders pending expedited briefing and a decision on the merits. ROA.505, 521-24. This Court noted that the district court's reasoning for release "reflect[ed] only the representations of defense counsel" and ignored evidence presented by the government and previous statements by Burger's own attorney recommending strict release conditions. ROA.523.

an objectively reasonable person would interpret Burger's statements as "a serious expression of an intent to cause present or future harm.'" *Id.* at 404 (quoting *United States v. Jubert*, 139 F.4th 484, 490 (5th Cir. 2025)). And it improperly resolved disputed factual questions about "whether Burger 'consciously disregarded a substantial risk that his communications would be viewed as threatening violence.'" *Id.* at 404 (quoting *Counterman*, 600 U.S. at 69). This Court concluded that "a trial on the merits is necessary to evaluate whether a reasonable jury could find that Burger's statements were true threats." *Id.* at 406.[17]

## III. On remand, the district court struck portions of the indictment and excluded most of the government's exhibits from the jury's consideration.

In preparation for trial, the district court issued the rulings that are the focus of this appeal.

First, the court struck two special findings from the indictment. ROA.611-12, 703, 784-85. After remand, a grand jury handed down a second superseding indictment adding special findings to Counts One and Two. ROA.611-12. The grand jury alleged that Burger had

[17] This Court also addressed two other issues, neither of which is pertinent to this appeal. First, this Court held that the district court had mooted its order releasing Burger unconditionally by later imposing conditions of release "including home detention, GPS monitoring, a prohibition on firearm access, and a requirement to attend counseling." *Burger*, 170 F.4th at 406. Second, this Court declined to reassign the case to a different district judge on remand. *Id.* at 406-10. This Court "trust[ed] that the district judge w[ould] set aside his view that 'if [he] were on the jury, [he] would acquit [Burger],' especially when determining the legal sufficiency of the evidence to support the jury verdict should Burger be convicted at trial." *Id.* at 410.

"intentionally selected a Christian concert as the object of his threat because of the actual and perceived religion of individuals associated with the Christian concert." ROA.612. The special findings cited section 3A1.1 of the U.S. Sentencing Guidelines, which increases a defendant's offense level "[i]f the finder of fact at trial . . . determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived . . . religion . . . of any person." U.S. Sent'g Guidelines Manual § 3A1.1 (U.S. Sent'g Comm'n 2025); ROA.611-12.

Burger moved to strike the special findings as surplusage under Federal Rule of Criminal Procedure 7(d). ROA.627. He argued that his motive was "irrelevant to the charges," "inflammatory," and "prejudicial." ROA.629. In response, the government explained that similar special findings had been routinely used to notify defendants that the government would be seeking a jury finding under section 3A1.1. ROA.686-91. Relatedly, the government requested that the jury be asked to determine—if it otherwise found Burger guilty of Count One or Count Two—whether Burger intentionally selected a Christian concert as the object of his threat because of the actual and perceived religion of individuals associated with the Christian concert. ROA.690, 728.

At a pretrial hearing, the district court heard briefly from the parties before announcing that it would take the motion to strike "under consideration," though it preemptively announced that it would not instruct the

jury to make findings on Burger's intentional selection of victims. ROA.727-30. Later in the same hearing, however, the district court said that it had "thought about" the issue and would "strike that language from the indictment." ROA.784-85. The district court did not explain its reasoning. ROA.727-30, 784-85. The next day, the court issued a written order memorializing—again without explanation—its striking of the special findings and its refusal to instruct the jury on them. ROA.702-03.

At the same pretrial hearing, the district court excluded 28 of the government's 36 proposed trial exhibits in full and another exhibit in part. ROA.1059, 1061-1101. Before the first appeal, the government had notified Burger that it intended to introduce a variety of evidence at trial, including materials and statements posted by Burger online or otherwise captured by his phone or the keylogger. ROA.353-56. The government explained that this evidence was intrinsic to the charged offenses and was otherwise admissible under Federal Rule of Evidence 404(b). ROA.353-56. That rule allows evidence of a defendant's other acts to show a defendant's motive, intent, preparation, plan, or knowledge, but not to show his character. *See* Fed. R. Evid. 404(b). In opposition, Burger argued that Rule 404(b) precluded the evidence and that it was more prejudicial than probative. ROA.407-22, 645-64.

When the district court turned to the government's proposed exhibits at the pretrial hearing, it "put . . . on the record" that it would "say as little as possible during th[e] hearing." ROA.736-37. The court

explained, "I understand if I say anything, the government is likely, on appeal, if they have an appeal, to argue again that I was prejudiced." ROA.736. Addressing the challenged exhibits as a group, the court ruled, "None of those are intrinsic to the crime. None of them." ROA.736. The court also announced, "The jury's not going to hear about a grand conspiracy starting back in July," and that it would exclude any evidence about "planning stuff." ROA.737.

Government counsel tried to explain that the government had to "prove the defendant's subjective intent, that he either knew he was making a threat, that he was making [a] threat with the knowledge that it would be perceived as a threat, or recklessly disregarding the risk that what he said would be a threat." ROA.737-38. But the court interjected:

> Let me stop there. Let me stop there. Saudi Arabia will never come up during this case. Nothing about Saudi Arabia is going to be involved in this case . . . . I'm not open for discussion here. I'm telling you, nothing about Saudi Arabia or these other foreign people is going to be part of the trial.

ROA.738. When government counsel asked to respond, the district court stopped him and said, "No. I've ruled." ROA.738.

The court then had the government present each challenged exhibit and excluded all but one, in most instances with little or no explanation. ROA.1059, 1061-1101. The court excluded

- all statements Burger made outside Roblox, including all statements he made in Discord or Telegram or typed into notes on his

phone, even when those statements were contemporaneous to the statements charged as threats, ROA.1061-62, 1065-67, 1087-93, 1098-99, 1392-95, 1432-49, 1469-74, 1485-89;

- most statements Burger made within Roblox, including the statements that prompted his uncle to express concern to him, statements about detonating explosives, and statements within the same month as the statements charged as threats, ROA.1063-65, 1074-76, 1081-83, 1413-19, 1493-94;[18]
- all exhibits showing that "xandersrange" and "nurullah" were the same person in Saudi Arabia, ROA.1069-70, 1396-1400;
- evidence that Burger was "crazz3pain," "Ghurabaah," "afrikan3r," and "FollowerOfTawhid," ROA.1067-69, 1084-85, 1491-92;[19]
- photographs of Burger holding firearms, ROA.1070-71, 1401-02;
- evidence showing Burger emulating ISIS imagery stored on his laptop and distributing ISIS propaganda, ROA.1071-72, 1085-86, 1091, 1404, 1431, 1450-68;
- the black flag that Burger received, ROA.1072, 1406;
- Google search terms recovered from Burger's phone, ROA.1072-73, 1407-12;

---

[18] The court allowed a set of entries captured by the keylogger in December 2024 in which Burger said, "Bro hes an informant," and "Yep hes def a fed." ROA.1077-79, 1495-98.

[19] The court excluded this evidence on the condition that Burger would stipulate to being "crazz3pain" and "Ghurabaah." ROA.1068-6, 1084-85. Burger did not submit that stipulation before the district court stayed proceedings.

- the handwritten notes with bomb-making plans, a list of terrorist attacks, and the notation "#JeSuisISIS" recovered from Burger when he was transferred to federal custody, ROA.1085, 1420-23;[20]
- evidence showing that Burger visited the website of concert promoter Live Nation the day he issued the second charged threat, ROA.1093-98, 1475-84; and
- the announcement of the Christian concert on April 12, 2025, ROA.1059, 1101, 1490.

Along the way, the court reiterated its earlier view that Roblox was just "a fantasy-type world." ROA.1071. In the same written order in which it struck the special findings, the district court listed without further explanation the evidence it had excluded. ROA.702-03.

The next day, the government appealed. ROA.704-05, 717-18.[21] On the government's motion, the district court stayed the trial during the appeal. ROA.706-07, 721. The next week, Judge Alan Albright, who had presided over the case until that point but had announced that he would be leaving the bench, transferred the case to Judge David Counts. ROA.725.

---

[20] Based on this exclusion, the government withdrew the reports and curriculum vitae of experts slated to explain that the handwritten notes could be used to construct an operational bomb, ROA.1085, 1091, 1425-30, 1499-1508.

[21] To resolve an objection by Burger to the first notice of appeal, the government submitted a revised notice the same day. ROA.710-11, 717-18. The notices are identical in substance, but the revised notice includes the handwritten signature of the U.S. Attorney. ROA.704-05, 717-18.

## Summary of the Argument

**I.** The district court erred legally, and thus abused its discretion, when it struck from the indictment the grand jury's special findings that Burger intentionally selected the object of his threats because of religion. The strict standard for striking allegations in an indictment as surplusage requires that those allegations be irrelevant, inflammatory, and prejudicial. The special findings the district court struck were relevant to Burger's offenses because they alleged his motive for the threats and concerned facts about his offense that a jury had to find at trial. And they were neither inflammatory nor prejudicial given the anti-Christian animus that the statements charged as threats already suggested. At a minimum, this Court should vacate the district court's unexplained order as too cursory to permit appellate review and remand for a reasoned decision.

**II.** The district court also abused its discretion in excluding all but one of the government trial exhibits that Burger challenged under Federal Rule of Evidence 404(b). The district court erred legally in holding that the statements and acts reflected in the exhibits were extrinsic to the charged offenses. Those statements and acts were intrinsic and so not subject to Rule 404(b) at all. Several were inextricably intertwined with the charged threats. And all of them established the seriousness of the charged threats by showing that Burger did not limit his threatening statements to what he now characterizes as role-playing on Roblox. Even

if the statements and conduct shown in the exhibits had been extrinsic to the charged threats, the district court clearly erred in assessing those exhibits under Rule 404(b). The court mistakenly dismissed as irrelevant evidence pertinent to Burger's mental state, a permissible purpose for evidence of extrinsic acts under Rule 404(b). And if the district court meant to exclude evidence as substantially more prejudicial than probative—without ever mentioning that concept—it clearly misassessed the relevant factors in doing so.

## Argument

This Court remanded this case for a jury trial to determine whether the statements charged as violations of 18 U.S.C. § 875(c) were true threats. *Burger*, 170 F.4th at 403-06. In determining whether the statements were true threats, the jury had to decide whether they were "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence'" as opposed to "jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Counterman*, 600 U.S. at 74 (quoting *Virginia v. Black*, 538 U.S. at 359). The district court's rulings hinder that determination.

The true-threats inquiry is "twofold." *Jubert*, 139 F.4th at 491. The first question is "whether a reasonable person would perceive the statement as threatening." *Id.* "Speech is a true threat and therefore unprotected if an objectively reasonable person would interpret the speech as a

serious expression of an intent to cause a present or future harm." *Id.* at 490. The second question is whether the speaker was "subjectively aware of [the statement's] threatening nature." *Burger*, 170 F.4th at 401. At a minimum, the speaker must be "aware that others could regard his statements as threatening violence and deliver[] them anyway." *Counterman*, 600 U.S. at 79.

For both parts of this twofold inquiry, "context is critical." *Burger*, 170 F.4th at 402 (quoting *Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023)). For example, this Court has looked to a defendant's "escalation" from insults to threats in determining that statements charged as crimes were "not spontaneous venting" but "targeted, sustained, and deliberate." *Jubert*, 139 F.4th at 491. The Third Circuit has approved the admission of evidence showing that the defendant was familiar with firearms and had mimicked prominent terrorists because this evidence showed the defendant's subjective intent in making statements later charged as threats. *United States v. Miah*, 120 F.4th 99, 110-13 (3d Cir. 2024). And the Seventh Circuit has approved a jury's consideration of testimony that the defendant had a "pervasive interest in explosives and domestic terrorism" because that testimony was relevant to whether the defendant intended that his statements that he would blow up a building be understood as a threat. *United States v. Parr*, 545 F.3d 491, 498-99 (7th Cir. 2008).

The district court did the opposite of treating context as critical. It stripped from the indictment factual allegations about Burger's motive

for the threats. And it tried to block the jury from seeing the statements and actions that put the charged threats into context. This Court should vacate both rulings.

## I. The district court abused its discretion in striking as surplusage portions of the indictment alleging Burger's motive.

The district court reversibly erred when it struck as surplusage two special findings by the grand jury that Burger intentionally selected a Christian concert as the object of his threats because of the actual and perceived religion of individuals associated with the concert. ROA.611-12, 703, 784-85. Federal Rule of Criminal Procedure 7(d) authorizes a district court, "[u]pon the defendant's motion," to "strike surplusage from the indictment." Fed. R. Crim. P. 7(d). But courts "rarely grant[] such a motion" because the standard for striking surplusage is "strict." *United States v. Solomon*, 273 F.3d 1108, 2001 WL 1131955, at *1 (5th Cir. 2001) (unpublished), and "exacting," *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971). The district court never explained why it thought that the findings it struck met this strict and exacting standard, and they did not.

### A. Standard of review: abuse of discretion.

This Court reviews for abuse of discretion the decision whether to strike allegations from an indictment. *Solomon*, 2001 WL 1131955, at *1. "By definition, a district court abuses its discretion when it makes an

error of law or applies an incorrect legal standard." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011).

### B. The district court abused its discretion by failing to apply the strict legal standard for striking allegations from an indictment.

The district court should not have struck the grand jury's special findings on Burger's motive as surplusage. The test for surplusage is conjunctive: For language to be struck as surplusage, "it must be irrelevant, inflammatory, *and* prejudicial." *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993) (emphasis added); *accord United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006); *United States v. Hedgepeth*, 434 F.3d 609, 612-13 (3d Cir. 2006) (collecting cases). "Where information in an indictment is sufficiently relevant to the charged offense, the court should not strike it, no matter how prejudicial it may be." *Solomon*, 2001 WL 1131955, at *1. To be relevant, an allegation need not constitute an element of the charged offense. *Id.*

The grand jury's special findings were relevant to the charged offenses, so the district court should not have struck them. A defendant's motive for a crime is relevant even if it is "sensational." *Graves*, 5 F.3d at 1550. The special findings bear on Burger's motive for his threats. ROA.611-12. They allege that in issuing the threats charged in Counts One and Two, Burger "selected a Christian concert as the object of his threat because of the actual and perceived religion of individuals associated with the Christian concert." ROA.611-12. That allegation of motive

made the special findings relevant to Burger's offenses and so not subject to being struck as surplusage.

The special findings were also relevant to Burger's offenses because they identified findings that the jury needed to make at trial to help establish the appropriate punishment for those offenses. Congress directed the U.S. Sentencing Commission to "promulgate guidelines or amend existing guidelines to provide sentencing enhancements of not less than 3 offense levels for offenses that the finder of fact at trial determines beyond a reasonable doubt are hate crimes." Violent Crime Control & Law Enforcement Act of 1994, Pub. L. 103-322, § 280003(b), 108 Stat. 1796, 2096. The Sentencing Commission implemented this directive in section 3A1.1(a) of the guidelines, which increases a defendant's offense level

> [i]f the finder of fact at trial . . . determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person[.]

USSG § 3A1.1(a). Grand juries commonly allege intentional selection under section 3A1.1(a) in special findings. *See, e.g.*, *United States v. Jiang*, No. 1:24cr65, 2025 WL 419531, at *11-12 n.6 (E.D. Va. Feb. 6, 2025) (collecting cases). And trial juries make the findings necessary for courts to apply the enhancement at sentencing. *See, e.g.*, *United States v. Taubert*, 810 F. App'x 41, 45 (2d Cir. 2020). By striking these special findings as

surplusage, the district court eliminated part of the indictment relevant to a determination about Burger's offenses that the jury needed to make.

The district court also erred because the special findings were neither inflammatory nor prejudicial. The relevant counts of the indictment already alleged that Burger had announced that he would "'deal a grevious [sic] wound upon the followers of the Cross' . . . for the purpose of issuing a threat." ROA.611-12. So Burger's animus toward Christians was already evident on the face of the indictment. *See* ROA.611-12. The special findings could have had no independent "inflammatory" or "prejudicial" effect. For this reason as well, the district court erred in striking the special findings from the indictment.

**C. At a minimum, this Court should vacate the order striking the special findings because the district court failed to explain it.**

Another reason to overturn the district court's order striking the special findings is its failure to explain its reasoning at all. "[J]udges have an obligation to say enough that the public can be confident that cases are decided in a reasoned way." *United States v. Handlon*, 53 F.4th 348, 353 (5th Cir. 2022). Thus, when a district court offers no reason for a decision challenged on appeal, this Court will vacate that decision and remand for an explanation. *See, e.g.*, *United States v. Gardner*, No. 20-50481, 2022 WL 422167, at *2 (5th Cir. Feb. 11, 2022). For example, in *Gardner*, this Court vacated an order denying a motion to withdraw a guilty plea

because that order was too cursory to permit appellate review, even for abuse of discretion. *Id.*

As it did in *Gardner*, the district court here offered no reasoning for its decision. At the hearing on Burger's motion to strike, the district court asked questions. ROA.727-30. Later, the court announced that it had "thought about" the issue and would "strike that language from the indictment." ROA.784-85. But it never explained why. ROA.727-30, 784-85. Its written order did not help: The court said only, "IT IS ORDERED that Defendant's Motion to Strike Surplusage . . . is HEREBY GRANTED. The Government is ordered to redact the Special Findings from the Second Superseding Indictment." ROA.703.

Absent any indication that the district court understood and applied the correct legal standard, its order striking portions of the indictment cannot stand. At a minimum, this Court should vacate that order and remand so that the newly assigned district judge who will preside at trial can consider the issue.

## II. The district court abused its discretion when it excluded from trial nearly every exhibit reflecting Burger's statements and actions before and after the statements specifically charged as threats.

Invoking Federal Rule of Evidence 404(b), the district court excluded every government trial exhibit Burger challenged except one. ROA.702-03, 1061-1101. With that one exception, it excluded Burger's statements before and after—sometimes minutes before—the statements

charged as threats. ROA.1061-67, 1074-79, 1081-83, 1087-93, 1098-99, 1392-95, 1413-19, 1432-49, 1469-74, 1485-89, 1493-98. It excluded other evidence that Burger had been radicalized. ROA.1071-72, 1085-86, 1091, 1404, 1406, 1423, 1431, 1450-68. It excluded evidence of Burger's identity and the identity of the persons with whom he was communicating. ROA.1067-70, 1084-85, 1396-1400, 1491-92. And it excluded all exhibits reflecting what it dubbed "the planning stuff," ROA.1057—Burger's searches, evidence linking those searches to an event, and evidence that he was prepared to use firearms and explosives. ROA.1059, 1070-73, 1085, 1093-98, 1101, 1401-02, 1407-12, 1420-21, 1475-84, 1490.

Under Rule 404(b), evidence of a defendant's "other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The rule authorizes the admission of other-acts evidence because it "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

The district court deliberately avoided explaining its rulings to prevent the government from arguing against those rulings on appellate

review. ROA.736-37. Even so, the court's limited statements make clear that it misunderstood the law and the evidence when it ruled. The court therefore abused its discretion, and its evidentiary rulings should be vacated and remanded for rulings by the judge who will preside at trial.

### A. Standard of review: abuse of discretion.

This Court reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Carpenter*, 140 F.4th 733, 740 (5th Cir. 2025). A district court has "wide discretion in criminal evidentiary matters." *United States v. Jackson*, 339 F.3d 349, 357 (5th Cir. 2003). But "[r]eview for abuse of discretion is not . . . tantamount to no review at all." *Id.* (cleaned up). "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *Carpenter*, 140 F.4th at 740.

### B. The district court abused its discretion by excluding evidence based on its misunderstanding of the law distinguishing intrinsic evidence from extrinsic evidence.

Just before announcing that it would "say as little as possible" to avoid making statements that the government could cite on appeal, the district court held that none of the challenged exhibits was intrinsic to Burger's criminal threats—"None of them." ROA.736; *see also* ROA.497 (expressing the same view pre-remand). That was legal error.

Evidence is "intrinsic," even if it pertains to an act other than the precise conduct charged as criminal, when "evidence of the other act and the evidence of the crime charged are inextricably intertwined."

*Carpenter*, 140 F.4th at 743 (cleaned up). Evidence is also intrinsic when "both acts are part of a single criminal episode"; or "the other acts were necessary preliminaries to the crime charged." *Id.* (cleaned up). For instance, evidence is intrinsic when it "establish[es] the timeline of events leading up to" a crime and "allow[s] the jury to evaluate all of the circumstances under which [a defendant] acted." *United States v. Gurrola*, 898 F.3d 524, 536-37 (5th Cir. 2018) (cleaned up). When evidence is intrinsic, "it simply does not implicate the requirements of Rule 404(b)." *Carpenter*, 140 F.4th at 743 (cleaned up).

The district court's statement that none of the challenged exhibits were intrinsic shows that it erred legally in distinguishing between intrinsic and extrinsic evidence in critical ways. The most striking example of the district court excluding inextricably intertwined acts involves the exchange surrounding Burger's third charged threat. That exchange began on the platform Discord, where Burger re-engaged a Saudi user—"nurullah" or "xandersrange"—who had witnessed and responded to Burger's earlier threat to attack a Christian concert. ROA.1393-95, 1400, 1494, 1509-16; Gov't Ex. 1C. When Burger told the Saudi user, "I think I've come to a conclusion on the when and where," the Saudi user responded, "Join me Im on roblox [sic]." ROA.1393. Burger agreed and two minutes later typed into Roblox, "I've come to conclude it will befall the 12 of Shawwal . . . [a]nd it will be a music festival[.]" ROA.1393-95, 1494. Yet the district court treated some parts of this single, continuous

conversation as extrinsic, and thus subject to Rule 404(b). And its error implicated a central issue at trial: Burger's defense all along has been that his threats were just "fantasy role playing" in Roblox, where "you can play a terrorist." ROA.893, 899. But he started his announcement of the threat in Discord, which is not a role-playing site. ROA.1393, 1494.

Compounding this error, the district court also excluded all exhibits showing that Burger was talking to the same person when he communicated with "nurullah" in Discord and "xandersrange" in Roblox. ROA.1069-70, 1396-1400. Without that evidence, the jury would not know that Burger was reinitiating a conversation with a person who had witnessed and responded supportively to his earlier threat. ROA.1393-95, 1400, 1494, 1512-13. Nor would the jury know that the person Burger was talking to had previously advised him about how to avoid attention from law enforcement. Gov't Ex. 1C. All of this evidence was inextricably intertwined with a charged threat, yet the district court declared it extrinsic.

Burger's other statements across Roblox and other platforms were also intrinsic because they "established the timeline of events leading up to" the charged threats so that the jury could "evaluate all of the circumstances under which [he] acted," *Gurrola*, 898 F.3d at 536-37. In a threat prosecution, a defendant's other threatening statements and conduct are intrinsic to the charged threats because they allow a jury to determine whether a defendant's statements are serious expressions of intent to

cause harm. *See, e.g.*, *United States v. Beeman*, 135 F.4th 139, 146-47 (4th Cir.), *cert. denied*, 146 S. Ct. 246 (2025); *United States v. Censke*, 449 F. App'x 456, 466-67 (6th Cir. 2011); *United States v. Springer*, 753 F. App'x 821, 828 (11th Cir. 2018). For example, in *Beeman*, the Fourth Circuit recognized that a threatening letter was intrinsic to a charge based on a subsequent threatening letter. 135 F.4th at 146-47. In *Censke*, the Sixth Circuit recognized that a defendant's prior statement was "critical information for the jury to weigh in deciding whether the later threat constitute[d] a 'true threat,' or, as Censke characterized it, a joke." 449 F. App'x at 466-67. And in *Springer*, the Eleventh Circuit recognized that images from a defendant's phone suggesting sympathy for ISIS and martyrdom were intrinsic because they made it more plausible that his statements were threats rather than hyperbole. 753 F. App'x at 828.

Burger's series of threatening online statements is no different. Burger made similarly threatening pronouncements through several means—not just in what he calls the "fantasy world" of Roblox. ROA.681-82, 899, 1061, 1088-90, 1392, 1448-68, 1469-71, 1488-89. As in *Beeman*, *Censke*, and *Springer*, the statements surrounding the charged threats established the nature of those threats and so were intrinsic to them. The district court's error in deciding otherwise shows that it "base[d] its decision[s] on an error of law or a clearly erroneous assessment of the evidence" and so abused its discretion. *Carpenter*, 140 F.4th at 740. Those decisions should be vacated.

### C. The district court abused its discretion by excluding evidence based on its misunderstanding of the law on true threats and its clearly incorrect assessment of the evidence.

Even if the challenged evidence were extrinsic, the district court reversibly erred in assessing it under Rule 404(b). The admissibility of evidence under Rule 404(b) turns on a "two-step test" that "requires a determination that (1) the extrinsic offense evidence is relevant to an issue other than the defendant's character and (2) the evidence possesses probative value that is not outweighed by its undue prejudice and meets the other requirements of [Federal Rule of Evidence] 403." *United States v. Ricard*, 922 F.3d 639, 653 (5th Cir. 2019) (cleaned up). The district court reversibly erred at both steps.

#### 1. The district court misunderstood the law of true threats and clearly erred in assessing the relevance of the challenged exhibits.

Under Rule 404(b), extrinsic-act evidence is admissible for a purpose other than proving a person's character, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The extrinsic act need not be relevant to an element of the crime. *See United States v. Kinchen*, 729 F.3d 466, 472 (5th Cir. 2013). For example, even when motive is not an element, "it is part of the story and provides context to the events in question." *Id.*

The district court excluded evidence as having no permissible purpose under Rule 404(b) because it misunderstood the law of true threats.

The court opined that exhibits reflecting Burger's "computer search history" and "later-discovered communications and sharing of bomb-making instructions and photographs" were "irrelevant to the jury's determination whether [his] communication was a true threat" because "[t]here [wa]s no claim that a recipient of the threatened communications was made privy to that evidence." ROA.497. But "the true threat determination is . . . not limited to what the recipient or target of the alleged threat knew about the defendant." *Parr*, 545 F.3d at 502. To show that Burger's statements were true threats, the government had to show his mental state—that he was "subjectively aware" of the "threatening nature" of the statements charged as threats. *Burger*, 170 F.4th at 401.

Yet the district court treated exhibits as having no permissible purpose under Rule 404(b) even when they established Burger's subjective awareness—his knowledge—of his statements' threatening nature. In one set of statements recorded by the keylogger, Burger announced that he "hate[d] all constitutions and government . . . [o]utside of the Sharia," had "a handgun and a couple of rifles," and "would . . . [d]efinitely kill a lot of cops someday." ROA.1413. Burger's uncle later told him that he found these statements alarming. ROA.1015-16. That combination of events helped establish that Burger had the requisite subjective awareness that these sorts of statements alarmed people before he repeated the behavior in the charged threats—in other words, that he was "aware that others could regard his statements as threatening violence" but

"deliver[ed] them anyway," *Counterman*, 600 U.S. at 79. For example, in *United States v. Elonis*, 841 F.3d 589, 599-601 (3d Cir. 2016), the Third Circuit held that no rational juror could have found that the defendant was unaware of the threatening nature of his online posts when the recipients of similar posts had told him that the earlier posts alarmed them. Yet the district court mistakenly regarded Burger's "later-discovered communications" as "irrelevant" because the audience for the charged threats did not see them. ROA.497.

The other challenged exhibits were also admissible for purposes allowed under Rule 404(b). Exhibits showing Burger's antipathy toward law enforcement and sympathy for ISIS were relevant to his motive. *See, e.g.*, *Miah*, 120 F.4th at 112 (affirming admission of a video showing the defendant "expressing an anti-police sentiment and singing about ISIS" because it was "probative of [his] incentive for threatening law enforcement with a terroristic attack"); *Springer*, 753 F. App'x at 828 (holding that exhibits showing a defendant's sympathy for ISIS established a motive for his threats). Exhibits showing Burger making similar statements across multiple platforms showed that he was not merely role-playing and so were relevant to his intent and the lack of any accident or mistake. *See, e.g.*, *United States v. Dysart*, 705 F.2d 1247, 1258–59 (10th Cir. 1983) (affirming the admission of prior threats to show that a defendant had intentionally issued charged threats); *United States v. Hall*, 583 F.2d 1288, 1291 & n.1 (5th Cir. 1978) (same). Exhibits showing that there was

a Christian concert to attack on April 12, 2025, that Burger had accessed the website for the company promoting that concert, and that Burger had searched for "festivals happening near me" were all relevant to preparation and planning. *See, e.g.*, *United States v. Viefhaus*, 168 F.3d 392, 395, 397-98 (10th Cir. 1999) (affirming admission of a list of facilities occupied by Jewish, Muslim, and Native American groups to show that violence threatened by a defendant was "the culmination of considerable planning for a racial holy war"). So were exhibits showing Burger's interest in and knowledge of firearms, explosives, and other weapons. *See, e.g.*, *Miah*, 120 F.4th at 111 (affirming admission of exhibits showing a defendant's "connection to firearms, tactical gear, and types of explosives" as relevant to the defendant's mental state and whether he "had the knowledge and means to carry out his threats of violence"); *Parr*, 545 F.3d at 501 ("[W]hen a person says he plans to blow up a building, he will naturally be taken more seriously if he has a history of building bombs and supporting terrorism.").

Because the district court based its assessment of the exhibits on a legal error—its misunderstanding of true threats—and on its clear failure to appreciate the relevance of other-acts evidence to establish motive, intent, lack of accident, plan, and preparation, it abused its discretion. For this reason as well, its evidentiary decisions should be vacated.

### 2. If the district court meant to exclude the challenged evidence as more prejudicial than probative, it clearly erred in assessing the need for and probative value of the evidence.

The district court never stated that it was excluding the challenged exhibits as more prejudicial than probative under Federal Rule of Evidence 403. But if it did, it clearly erred. District court determinations under Rule 403 "are given an especially high level of deference" and reversed "rarely" and "only when there has been a clear abuse of discretion." *United States v. Rider*, 94 F.4th 445, 456 (5th Cir. 2024) (cleaned up). But the district court's discretion "is not unlimited." *United States v. Gluk*, 831 F.3d 608, 616 (5th Cir. 2016). This Court and others have reversed district courts' determinations under Rule 403. *See, e.g.*, *id.*; *United States v. Bergrin*, 682 F.3d 261, 278-81 (3d Cir. 2012) (reversing a district court's order excluding evidence of other bad acts); *United States v. Siegel*, 536 F.3d 306, 319-21 (4th Cir. 2008) (same).

Excluding almost every challenged government exhibit under Rule 403 would have been a clear abuse of discretion. Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403 (emphasis added). Thus, it is not enough that evidence prejudices a defendant, for "[r]elevant evidence is inherently prejudicial." *United States v. Portillo*, 969 F.3d 144, 179 (5th Cir. 2020). Rather, "it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *Id.* This Court "consider[s] several factors

in determining whether the prejudicial effect of the extrinsic evidence outweighs its probative value: (1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions." *Kinchen*, 729 F.3d at 473. Any assessment the district court made under these factors—and none is evident—was clearly wrong.

First, for all the reasons discussed above, the district court erred legally in assessing the government's need for the challenged exhibits. *See supra* pp. 41-48. According to Burger's counsel, a key issue at trial will be "the correct characterization of the content of Roblox": whether Burger was "role playing as a terrorist" in a "fantasy world" or "expressing a sincere intent to commit violence." ROA.733, 899. The government has "a justifiable need" for extrinsic evidence of a defendant's mental state when that mental state is the "central issue at trial." *Ricard*, 922 F.3d at 654; *see also United States v. Juarez*, 866 F.3d 622, 627 (5th Cir. 2017) ("Extrinsic evidence has high probative value when intent is the key issue at trial."). The court also erroneously assigned no weight at all to the government's need to prove that Burger intentionally selected the target of his threats based on religion, *see* USSG § 3A1.1(a). Instead, it struck the special findings and preemptively refused to instruct the jury on that matter. ROA.611-12, 703, 730, 784-85.

The other three factors also support admission. "Other acts are more probative of intent when they are similar to the charged acts." *United States v. Williams*, 30 F.4th 263, 268 (5th Cir. 2022). The statements the court excluded were similar to the charged threats. *See supra* pp. 13-22. The time separating Burger's other statements and conduct from his charged threats was sometimes mere minutes and at most a few months. *See id.* That is well within the allowable period for other-acts evidence. *See Juarez*, 866 F.3d at 628 (explaining that this Court has found admissible misconduct committed less than three years before the charged crime). And the court never considered whether limiting instructions might have addressed any concerns about unfair prejudice. *Cf. id.* at 628-29 (noting preventative measures to reduce any prejudicial effect); *Springer*, 753 F. App'x at 829 (approving a limiting instruction to address concerns about evidence of a defendant's ISIS sympathies).

No legally accurate balancing of these factors could have resulted in the wholesale rejection of all but one of the government's challenged exhibits. This Court should vacate the district court's evidentiary rulings and remand for reconsideration under the correct standard.[22]

[22] The district court excluded one exhibit after Burger argued that it was hearsay. ROA.1087-88, 1432-47. That argument is insupportable. The exhibit reflects a chat on Discord involving Burger using the name "afrikan3r." ROA.1432-47 (chat); ROA.1491 (exhibit linking Burger to "afrikan3r"); Gov't Ex. 1C. In the chat, Burger told another user that he deleted his "Ghurabaah" account after hearing that someone was asking about it. ROA.1432-47. The portions of the chat reflecting Burger's statements are not hearsay because they were made by and offered against him. *See* Fed. R. Evid. 801(d)(2)(A). And the statements by the other user are not hearsay because the government is not offering them to prove the truth of anything asserted by

## Conclusion

This Court should reverse or vacate the district court's order striking portions of the indictment, vacate the district court's evidentiary rulings, and remand for further proceedings.

Respectfully submitted,

Justin R. Simmons
United States Attorney

*/s/ Zachary C. Richter*
By: Zachary C. Richter
Assistant United States Attorney

that user. *See* Fed. R. Evid. 801(c)(2). Rather, the government offered the chat to show that Burger tried to conceal his connection to Ghurabaah, which shows consciousness of guilt. ROA.681; *see United States v. Martinez*, 921 F.3d 452, 476 (5th Cir. 2019) (explaining that concealment is evidence of consciousness of guilt).

## Certificate of Service

I certify that on August 12, 2026, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel.

*/s/ Zachary C. Richter*
Zachary C. Richter
Assistant United States Attorney

* * *

## Certificate of Compliance

I certify that:

(1) this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,108 words, excluding the parts of the brief exempted by Rule 32(f); and

(2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Calisto MT font.

Dated: August 12, 2026

*/s/ Zachary C. Richter*
Zachary C. Richter
Assistant United States Attorney