# No. 26-50396

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

JAMES WESLEY BURGER,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Western District of Texas
No. 1:25-cr-332-DC-1

---

**BRIEF OF DEFENDANT-APPELLEE**

---

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

JOSE GONZALEZ-FALLA
Assistant Federal Public Defender

*Attorney for Defendant-Appellee*

## CERTIFICATE OF INTERESTED PERSONS

**UNITED STATES v. JAMES WESLEY BURGER,,**
**No. 26-50396**

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **James Wesley Burger,** Defendant-Appellee;

2. **Justin R. Simmons,** U.S. Attorney:

3. **Mark T. Roomberg** and **Keith M. Henneke,** Assistant U.S. Attorneys, and **G. Karthik Srinivasan,** former Assistant U.S. Attorney, who represented Plaintiff-Appellant in the district court;

4. **Zachary Richter,** Assistant U.S. Attorney, who represents Plaintiff-Appellant in this Court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Carl R. Hennies,** Assistant Federal Public Defender, who represented Defendant-Appellee in first appeal;

7. **Charlotte Anne Herring,** Assistant Federal Public Defender, and **Jesus M. Salinas, Jr.,** former Assistant Federal Public Defender, who represented Defendant-Appellee in the district court; and

8. **Jose I. Gonzalez-Falla,** Assistant Federal Public Defender, who represents Defendant-Appellee in this Court and in district court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Jose Gonzalez-Falla
JOSE GONZALEZ-FALLA
*Attorney for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Burger requests oral argument. Oral argument will help the Court understand the district court's justification for striking Special Findings from the indictment and for excluding evidence from the anticipated jury trial.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..... i

STATEMENT REGARDING ORAL ARGUMENT ..... iii

TABLE OF AUTHORITIES ..... vii

ISSUES PRESENTED FOR REVIEW ..... 1

STATEMENT OF THE CASE ..... 2

A. The "weird toxic debate game" called the Church experience was where Burger made the statements that two tipsters reported to the FBI. ..... 4

B. Burger, speaking through avatars "Ghurabaah" and "Crazz3pain," made statements in Church that were reported by other players to the FBI, leading to Burger's indictment for making online threats. ..... 6

C. Burger moves to dismiss the indictment. ..... 9

D. The district court rejects the Government's "bootstrapping" and dismisses the indictment ..... 10

E. This Court reverses the dismissal order, holding that the indictment presented questions for the jury. ..... 11

F. On remand, the Government supersedes the indictment a second time and alleges that Burger intentionally selected a Christian concert as the object of his threat. ..... 12

G. At the pretrial conference, the district court excludes Government exhibits and strikes the special findings from the second superseding indictment ..... 15

SUMMARY OF THE ARGUMENTS ..... 26

ARGUMENTS AND AUTHORITIES ..... 28

I. The district court properly struck special findings from the indictment that were irrelevant, inflammatory, and prejudicial. .......... 28

A. Standard of review. .......... 28

B. The district court did not abuse its discretion, much less plainly, when it struck "Special Findings" from the indictment because they were irrelevant and prejudicial and risked misleading and confusing the jury about the elements necessary for a conviction. .......... 29

1. There is no requirement that the findings necessary for the Guidelines sentencing enhancement be alleged in the indictment. .......... 31

2. The Special Findings risk confusing the jury about the elements and inflaming the jury against Burger. .......... 33

C. Even if there was plain error, the Government cannot satisfy the remaining requirements for reversal: any error does not seriously affect the Government's substantial rights or adversely affect the fairness, integrity, or reputation of the proceedings because there is an alternative procedure available to provide notice to Burger and to secure the necessary jury findings. .......... 35

II. The district court did not clearly, much less plainly, abuse its discretion when it excluded the Government's proposed evidence under Rule 404(b). .......... 36

A. Standard of review. .......... 36

B. The district court did not clearly abuse its discretion when it excluded evidence of an uncharged plot to attack a Christian concert that it found to lack conditional relevance and deemed to be otherwise extrinsic, irrelevant, and unfairly prejudicial. .......... 37

1. The Government's proposed evidence was extrinsic, not intrinsic. .......... 38

2. The district court did not abuse its discretion when it found that the Government had failed to establish a necessary preliminary fact to establish conditional relevance: that Burger had knowledge of the Christian concert it claimed he was plotting to attack. .......... 43

3. The district court did not clearly abuse its discretion when it excluded the extrinsic plot evidence and strictly limited the Government's evidence to that which was relevant to assessing the statements Burger made in the Church experience. .......... 45

4. The district court did not clearly abuse its Rule 403 discretion when it refused to let the Government put its "Frankenstein" together and excluded from trial evidence of a plot to attack a Christian concert that the Government was unable to show Burger even knew about, and which if presented, poses the risk of confusing and misleading the jury. .......... 47

C. Even if there was obvious error, the Government has failed to meet the difficult burden of meeting prongs three and four. .......... 51

CONCLUSION .......... 52

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .......... 53

# TABLE OF AUTHORITIES

## Cases

*Alleyne v. United States*,
570 U.S. 99 (2013) .......... 31

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) .......... 51

*Dawson v. Delaware,*
503 U.S. 159 (1992) .......... 50

*Erlinger v. United States*,
602 U.S. 821 (2024) .......... 32, 36

*Huddleston v. United States*,
485 U.S. 681 (1988) .......... 37, 43, 44

*Jacobson v. United States,*
503 U.S. 540 (1992) .......... 50

*Puckett v. United States*,
556 U.S. 129 (2009) .......... 29, 35, 51

*Spencer v. Texas,*
385 U.S. 554 (1967) .......... 32

*Stanley v. Georgia,*
394 U.S. 557 (1969) .......... 50

*United States v. Beechum*,
582 F.2d 898 (5th Cir. 1978) (en banc) .......... 38, 48

*United States v. Beeman*,
135 F.4th 139 (4th Cir. 2025) .......... 42

*United States v. Brown*,
608 F.2d 551 (5th Cir. 1979) .......... 39

*United States v. Bullock*,
451 F.2d 884 (5th Cir. 1971) .......................................... 30, 31, 34

*United States v. Burger*,
170 F.4th 395 (5th Cir. 2026) (per curiam) .........................*passim*

*United States v. Censke*,
449 F. App'x 456 (6th Cir. 2011) ................................................ 42

*United States v. Fields*,
483 F.3d 313 (5th Cir. 2007) ...................................................... 37

*United States v. Graves*,
5 F.3d 1546 (5th Cir. 1993) ................................................ 28, 34

*United States v. Gurrola*,
898 F.3d 524 (5th Cir. 2018) ...................................................... 41

*United States v. Gutierrez-Mendez*,
752 F.3d 418 (5th Cir. 2014) ......................................37, 38, 39, 45

*United States v. Jiang*,
No. 1:24-cr-65 (RDA), 2025 WL 419531
(E.D. Va. Feb. 6, 2025) ........................................................ 34, 35

*United States v. Jimenez*,
613 F.2d 1373 (5th Cir. 1980) .................................................... 39

*United States v. Poore*,
594 F.2d 39 (4th Cir. 1979) ................................................. 30, 31

*United States v. Pope*,
613 F.3d 1255 (10th Cir. 2010) .................................................. 12

*United States v. Ridlehuber*,
11 F.3d 516 (5th Cir. 1993) ................................................ 39, 40

*United States v. Seale*,
600 F.3d 473 (5th Cir. 2010) ...................................................... 37

*United States v. Solomon*,
273 F.3d 1108, 2001 WL 1131955
(5th Cir. 2001) (per curiam) (unpublished) ................................ 34

*United States v. Springer*,
753 F. App'x 821 (11th Cir. 2018) ................................................ 42

*United States v. Sumlin*,
489 F.3d 683 (5th Cir. 2007) .............................................. 39, 40

*United States v. Valle*,
807 F.3d 508 (2nd Cir. 2015) ....................................................... 50

*United States v. Williams*,
30 F.4th 263 (5th Cir. 2022) ........................................... 36, 37, 43

*United States v. Williams*,
445 F.3d 724 (4th Cir. 2006) ........................................................ 34

**Statutes**

18 U.S.C. § 875(c) .......................................................... 1, 2, 29, 31

**Rules**

Fed. R. App. P. 32(a)(5) ................................................................ 53

Fed. R. App. P. 32(a)(6) ................................................................ 53

Fed. R. App. P. 32(a)(7)(B) ........................................................... 53

Fed. R. App. P. 32(f) ..................................................................... 53

Fed. R. Crim. P. 7(d) ............................................................... 13, 30

Fed. R. Crim. P. 51(b) ................................................................... 49

Fed. R. Crim. P. 52(b) ........................................................ 28, 35, 37

Fed. R. Evid. 104(b) ...................................................................... 43

Fed. R. Evid. 403 ............................................................. 14, 20, 48

Fed. R. Evid. 404(b) ............................................................ *passim*

Fed. R. Evid. 404(b)(3)(B) ....................................................... 14, 17

**United States Sentencing Guidelines**

U.S.S.G. §3A1.1.......................................................................... 30

U.S.S.G. §3A1.1(a) ..................................................................... 30

## ISSUES PRESENTED FOR REVIEW

Burger is charged in a three-count indictment with transmitting threats online, in violation of 18 U.S.C. § 875(c). The issues presented for review are:

1. Did the district court abuse its discretion in striking the "Special Finding[s]" in the second superseding indictment, which would require the jury to find the facts necessary to apply a hate-crimes enhancement under the Sentencing Guidelines?

2. Did the district court abuse its discretion in excluding from trial, under Federal Rules of Evidence 403 and 404(b), many of the Government's proposed exhibits that sought to establish an uncharged plot as a means of proving the charged threats?

## STATEMENT OF THE CASE

This is the second appeal in this case, which arises out of statements that Burger, then a high school student, made in a virtual Church "experience" inside a popular online gaming platform called Roblox. Two tipsters, also high school students playing in the "experience," reported two of Burger's statements to the FBI. Those reports led to an indictment charging Burger with transmitting threats online, in violation of 18 U.S.C. § 875(c).

In the first appeal, the Government challenged the district court's dismissal of the indictment on First Amendment grounds. The district court agreed with Burger that the statements could not rationally be construed as "true threats" within the fantasy context of the Church experience. This Court reversed: *United States v. Burger*, 170 F.4th 395 (5th Cir. 2026) (per curiam). The Court found that the gaming context of the Church experience did not "categorically immunize" the statements against prosecution and that "a trial on the merits is necessary to evaluate whether a reasonable jury could find that Burger's statements were true threats." *Id.* at 406.

In this second appeal, the Government challenges two pretrial rulings that the district court made on remand. First, the

Government argues that the court erred by striking, as surplusage, special hate-crime findings that the Government added in a second superseding indictment. Second, the Government argues that the court abused its discretion in excluding a raft of the Government's proposed trial exhibits regarding Burger's statements and actions that occurred beyond the context of the Church experience and the perception of the players who witnessed the statements charged to be threats.

This Court should affirm. Although the Sentencing Guidelines require a jury to find the hate-crime allegations added to the second superseding indictment, there is no requirement that the allegations be included in the indictment. Their inclusion was irrelevant and prejudicial and risk misleading and confusing the jury about the elements necessary for a conviction. And the district court correctly excluded many of the Government's proposed trial exhibits designed to lead the jury to convict Burger of an uncharged plot to attack a Christian concert rather than the alleged threats charged in the indictment.

### A. The "weird toxic debate game"[1] called the Church experience was where Burger made the statements that two tipsters reported to the FBI.

As explained in the Court's opinion in the first appeal, Roblox is "a popular online gaming platform and game-creation system." *Burger*, 170 F.3d at 396–97. The Roblox platform hosts millions of user-created "experiences," which include "games, virtual worlds, and social spaces." *Id* at 397. Roblox users build the experiences on the platform using its free development tool. *Id*. Then, other users can join in the experiences. *Id*.

"The statements at issue in this case took place in an experience called 'Church.'" *Burger*, 170 F.3d at 397. To play the game, participants entered a virtual church through a set of doors. *Id*. They faced a large cross and pulpit, with rows of pews in between. *Id*. Lego-like avatars occupied the Church. *Id*. They walked around or stood in groups or sat in pews and argued. *Id*. They communicated using a chat function. *Id*. When a player typed a message, the message appeared in a chat window or a speech bubble above the avatar's head. *Id*. The bubbles disappeared after being visible to other players in the experience for a few seconds. *Id*.

---

[1] A blogger used this term to describe the Church experience on Roblox, where the threats were alleged to have been made. ROA.323.

The Church experience was about speech and debate. ROA.323. There was no score to keep, no goal to reach, no feat to accomplish. ROA.323. The entertainment came from talk and provocation. ROA.323. The chats ranged from the mundane to the extreme, covering topics such as race, religion, and politics. ROA.323.

Players customized their avatars to align their appearance to an identity they wished to portray. ROA.323. One avatar dressed like a skinhead might argue about white supremacy. *Burger*, 170 F.3d at 397–98. Another avatar dressed like a Nazi SS officer could deny the Holocaust and espouse antisemitism. *Id.* at 398. Avatars dressed in Middle Eastern clothing could debate the Koran or talk about violent jihadism. *Id.*

The Church experience was enormously popular in the online gaming community, logging over 20 million visits until it was taken down after Burger's arrest. ROA.323; *Burger*, 170 F.3d at 397. One gaming blogger described it as a "weird toxic debate game" drawing "one of the strangest playerbases in all of gaming." ROA.323.

### B. Burger, speaking through avatars "Ghurabaah" and "Crazz3pain," made statements in Church that were reported by other players to the FBI, leading to Burger's indictment for making online threats.

In January 2025, Burger was an 18-year-old high school senior living in Round Rock, Texas. ROA.77. Through avatars in the Church experience he made statements that became charged as threats in a three-count indictment.

First, on January 21, 2025, Burger's avatar "Ghurabaah" said:

> Yes I have guns
> Incase the authorities
> Want to arrest me.

ROA.67–68, 329. Ghurabaah was dressed in Arab garb and seated in a pew. ROA.329. Next to him was "Phantomcontender." Phantomcomtender asked: "What are u gonna do if they try." ROA.330. Ghurabaah responded:

> I am ready
> To sacrifice my life For my Rabb
> Detonate what I've prepared
> Of munition
> And use my firearms
> To take many with me
> Yes wish me luck
> On the path to martyrdom
> In'shaa'alla

ROA.330. A Roblox user in Pennsylvania saw the statements and called the FBI tip line to report what he had witnessed.[2] ROA.361.

Two days later, on January 23, Burger returned to the Church experience as "Crazz3pain." ROA.324. Also dressed in Arab garb, he took part in another chat that resulted in a second tipster calling the FBI tip line. ROA.361. Crazz3pain said:

> It will be months
> Shawall
> April
> It will be a glorious wound
> Upon their capital
> And deal a grievous wound upon followers of the Cross
> I cannot confirm anything aloud at the moment
> But things are in motion
> Don't delay yourselves too long brother, Jannah awaits us.

ROA.325–326.

[2] The statement, the first in chronological order, was alleged in Count Three of the Second Superseding indictment. ROA.613. The tipster's call was recorded and transcribed. *See* ROA.1727–31 (Defendant's Ex.11). Neither the statement itself nor the tipster's call mentioned a music event, much less a Christian concert. ROA.1727–31. Nonetheless, Count Three alleged that the statement was made "in the context of Defendant's plan to attack a Christian concert." ROA.613.

Four days later, on January 27, a keylogger[3] that Burger's uncle put on the family laptop captured the following statement on Roblox:

> I've come to conclude it will befall the 12 of Shawal aa
> And it will be a music festival
> Attracting bounties of Christians
> In'shaa'alah we will attain martyrdom
> And deal a grievous wound upon the folowers of the Cross
> Pray for me and enjoin yourself to martyrdom.

ROA.1494. The FBI did not get a call about this statement. Only the keylogger report documented it. *Burger*, 170 F.4th at 399. Nothing shows the other players who were present, what their reaction, if any, was to the statement, which of Burger's avatars made the statement, or where in Roblox the statement was made. *Id.*; ROA.1494.

A grand jury indicted Burger with two counts of transmitting threats in interstate commerce based on the statements made on January 23 and January 27, 2005. ROA.42–43. When Burger rejected the Government's plea offer, the government superseded the

---

[3] A "keylogger" is a piece of software that records the signals sent from a keyboard to a computer usually for the purpose of gaining information about the user without the user's knowledge. *Keylogger*, Merreiam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/keylogger (last visited Nov. 10, 2026).

indictment to add Count Three, the first of the three statements in chronological order.[4] ROA.66–68, 937–38.

### C. Burger moves to dismiss the indictment.

Burger moved to dismiss the indictment. ROA.321–43. He argued that the charged statements were not "true threats" and were therefore protected by the First Amendment. ROA.334–39.

At the two hearings on the motion to dismiss, ROA.881–942, 944–81,[5] the Government argued that Burger was not role-playing in the Church experience but was really a "lone wolf terrorist" who was using the Church experience as a "communication platform" to discuss a plot to attack a Christian concert in Austin, Texas. ROA.911–14. The Government pointed to chats Burger had on other messaging platforms where he discussed an interest in firearms, explosives, and ISIS. ROA.913–15. While the Government asserted

---

[4] Although Count Three alleged the statement was made "in the context of Defendant's plan to attack a Christian concert," neither the statement nor the tipster mentioned a music event. *See* ROA.1727–31.

[5] At the first hearing, the district court also took up Burger's motion to suppress statements he made when interrogated during the Government's execution of a search warrant at his home. ROA.883. The Government said that it would not use the statements in its case-in-chief at trial but reserved the right to use them if Burger were to "open the door." ROA.883.

that the "evidence would show beyond a reasonable doubt" that Burger was "planning to attack a Christian concert," ROA.950, it admitted that none of the statements, in isolation or together, could support a criminal charge. ROA.961–962. As to the claimed target of Burger's attack, the Government said, "There was a concert—a Christian concert scheduled in April in Austin.... Can we make a definitive link to that? We can't." ROA.935.

The district court asked the Government if Burger's activity on the other platforms broke any laws. ROA.961. The Government answered that "it was too early in his plan before we could charge that." ROA.962. The Government conceded that the "threats themselves" were all it could charge. ROA.960. The court called this "bootstrapping." ROA.962. The court said the Government was asking it to find that Burger's statements were "true threats" based on evidence that "by itself would not be criminal." ROA.962.

### D. The district court rejects the Government's "bootstrapping" and dismisses the indictment.

The district court ordered the indictment dismissed, finding that the First Amendment "wins the case." ROA.977. Mindful of the First Amendment, the court strictly limited the threat framework to the statements that the tipsters in the Church experience

witnessed and rejected the Government's attempt to "bootstrap" Burger's other statements and activities, including the speculative plot, into the analysis:

> Specifically, the Government points to Mr. Burger's computer search history and later-discovered communications and sharing of bomb-making instructions and photographs with another individual. Dkt. 59 at 4–7. There is no claim that a recipient of the threatened communications was made privy to that evidence. Accordingly, the evidence is extrinsic, out-of-context, and irrelevant to the jury's determination whether Mr. Burger's communication was a true threat.

ROA.497.

The Government appealed from the dismissal order. ROA.466.

### E. This Court reverses the dismissal order, holding that the indictment presented questions for the jury.

This Court reversed the order dismissing the indictment and remanded the case for trial. *Burger*, 170 F.4th at 401–06. It held that "a trial on the merits is necessary to evaluate whether a reasonable jury could find that Burger's statements were true threats." *Id.* at 406. The Court described the factual issue for the jury as follows:

> Here, the district court's findings resolved a disputed factual question: whether the context of the Church experience would lead a reasonable player to believe that Burger was role-playing rather than expressing a sincere intent to commit violence. Given that the district court's dismissal of each count depended on the "role-playing context" of the Church

> experience, the testimony from the tipsters would at the very least "provide a more certain framework for [the district court's] analysis.

*Burger*, 170 F.4th at 405 (quoting *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010)).

### F. On remand, the Government supersedes the indictment a second time and alleges that Burger intentionally selected a Christian concert as the object of his threat.

On remand, the Government obtained a second superseding indictment. ROA.611–13. The Government added "Special Finding[s]" to Counts One and Two alleging that "Defendant Burger intentionally selected a Christian concert as the object of his threat because of the actual and perceived religion of the individuals associated with the Christian concert."[6] ROA.611–12. No Special Finding was added to Count Three, which in chronological order was the

---

[6] The Special Findings were inconsistent with concessions the Government had made before the district court. Five months earlier, in a pretrial hearing, the Government conceded that it could not "definitively link" Burger's "plot" to a Christian concert. ROA.935. Similarly, at Burger's post-dismissal order detention hearing, the Government admitted that none of Burger's out-of-Roblox activity was "in and of itself … criminal conduct." ROA.1019. Yet the special findings made the Government's noncriminal plot theory part of Counts One and Two of the indictment.

first allegedly threatening communication Burger made in the Church experience. ROA.613.

Burger moved to strike the special findings from the indictment as surplusage, under Fed. R. Crim. P. 7(d). ROA.627–35. He argued that the special findings were "irrelevant, inflammatory, and prejudicial," in addition to being unnecessary to alter the otherwise applicable statutory sentencing range. ROA.629–30.

Burger also filed a supplemental response to the Government's notice of intent to introduce evidence under Fed. R. Evid. 404(b) at trial.[7] ROA.645–65. First, Burger repeated his arguments from his first 404(b) response that the Government's notice failed to specify how any piece of evidence met a category of admissibility. ROA.647. Second, Burger challenged the Government's claim that its

[7] The 404(b) notice was one of several filings the Government made before the indictment was dismissed. ROA.347–350. Burger responded at that time. ROA.407–22. He disputed the Government's claim that its proposed 404(b) evidence was "intrinsic" to the charged threats and complained that the Government had failed to make any specific argument as to why the evidence fit any of Rule 404(b)'s exceptions. ROA.409. Burger also pointed out that the Government's notice listed "predisposition to commit the charged crimes" as one of the purposes of its evidence, a ground that is specifically prohibited by Rule 404(b). ROA.413. Burger supplemented his first response on the same day the Government filed its "Trial Brief Regarding 404(b) Evidence" on remand. ROA.666.

proposed evidence was "intrinsic" to showing that he "was serious about his threats to attack Christians and a Christian concert," and pointed out that none of the exhibits "reference or relate" to a "Christian concert." ROA.647–50. Third, Burger maintained that the Government's proposed 404(b) evidence could be relevant only to his character and was therefore inadmissible. ROA.650. Finally, Burger argued that any probative value of the exhibits was substantially outweighed by undue prejudice and the potential to confuse the jury. ROA.656–63; *see* Fed. R. Evid. 403.

Later the same day, the Government filed its trial brief regarding its proposed 404(b) evidence. ROA.666–85. The Government maintained that the evidence was "intrinsic" to the threat charges, as well as relevant to the hate-crime special findings. ROA.674–83. Alternatively, the Government argued that, if the evidence was extrinsic, it fit within Rule 404(b)'s exceptions allowing the evidence to be admitted. ROA.673–83. However, the Government's notice remained deficient on this point: it failed to comply with Rule 404(b)(3)(B)'s requirement that it specify how any of the evidence fulfilled any of those permissible purposes. *See* ROA.673–683.

Before the scheduled pretrial conference, the district court asked the parties to provide it with a list of disputed issues.

ROA.1738–40. In an email to the court, the parties identified those issues as Burger's motions to strike surplusage and to exclude 404(b) evidence.[8] ROA.1738–39. Burger also challenged the admissibility of a new Government exhibit: a screenshot of a website announcing a concert occurring on April 12, 2025, featuring Christian artist Josiah Queen at the Emo Center in Austin, Texas. ROA.1738–39.

### G. At the pretrial conference, the district court excludes Government exhibits and strikes the special findings from the second superseding indictment.

At the pretrial conference, the district court first addressed Burger's motion to strike the special findings from the second superseding indictment. ROA.1047–50. After brief argument from both parties, the district court said it would "take this under consideration." ROA.1050.

Turning to "my issue No. 2," the district court asked if the Government intended to add as an exhibit "a screenshot of an EMO website showing a concert occurring on April 12, 2025, featuring a

[8] The Government was also objecting to defense exhibits showing Burger with his family and recordings made of activity in the Church experience. ROA.1739. The Government did not raise its objections to proposed defense exhibits during the pretrial conference.

Christian artist."[9] ROA.1051. The exhibit was first mentioned in the parties' email to the district court setting forth the disputed issues to be resolved at the pretrial conference. ROA.1739. In the email, Burger objected to it "on relevancy and/or 403 substantial prejudice grounds because [he] played no role in identifying or locating this music venue and therefore it bears no relevance to the threats charged in the indictment." ROA.1739.

Under questioning by the district court, the Government said that the date April 12th connected Burger with the concert the exhibit announced. ROA.1051. The Government argued that because Burger picked April 12th as the date he "was going to bring a grievous wound" and this was the date the concert was to take place, it was a "logical circumstantial inference" that Burger knew about the event. ROA.1052. The district court called this a "leap" and pointed to troves of data the Government extracted from Burger's devices in which the concert did not appear. ROA.1052. The district court

---

[9] The district court was referencing Government 27. The exhibit was a screenshot from "Do512," a website that promotes "Awesome stuff in Austin." ROA.1490. It advertised an event titled "Josiah Queen: My Promised Land Tour W/Strings & Heart." ROA.1490. The words "Live Nation" do not appear on the exhibit. ROA.1490. Neither does the word "Christian." ROA.1490.

asked Burger to explain his position on the exhibit and other 404(b) material. ROA.1052–53.

Burger objected to it and the other 404(b) exhibits. First, Burger objected that the Government's 404(b) notice failed to articulate a specific permissible purpose and provide the reasoning or inferences to support it as required by Rule 404(b)(3)(B). ROA.1053. Second, Burger objected that the 404(b) evidence fell outside the *Burger* opinion's threat framework: "whether the context of the church experience would lead a reasonable player to believe that Burger was role playing rather than expressing a sincere intent to commit violence."[10] ROA.1053.

Burger explained that the Government was misunderstanding the subjective intent element and how it related to the Church experience context:

> And the issue—the intent for the jury—I think where we differ so dramatically from the government is the government thinks that it's going to prove that Mr. Burger intended to be a terrorist and intended to attack a Christian concert that the Court just asked about. But that's not the intent before the jury.

[10] The statement from defense counsel comes from language in the *Burger* opinion. *Burger*, 170 4th at 405.

> The issue the jury has to decide is whether he intended his statements on Roblox, the charged statements, to be threats. So generalized evidence that the government believe[s] shows Mr. Burger is a terrorist doesn't inform whether he intended those specific charged statements in Roblox to be threats.

ROA.1055.

In response, the Government argued that it needed to put on its plot evidence to prove that the statements were threats:

> Yes, Your Honor.
>
> First, and I disagree with my learned colleague in that this whole start from July 24th of 2024 up to the time he was arrested, yes. The threats happened on July 21st, July 23rd, and July 27th. But all of these are intrinsic—I'm sorry, January. All of these are intrinsic to the threat itself.
>
> His planning, going back to July 24th—I'm sorry. July 24th, 2024, where he swears his loyalty to the head of Isis and talks about wanting to kill police. All the way up through when he actually finishes his plans, picks his date, makes his threats, and then talks about after, these are all intrinsic to the crime.

ROA.1056.

The district court disagreed:

> THE COURT: None of those are intrinsic to the crime. None of them. None of them have to do with whether or not—I'm not—I'm going to say as little as possible during this hearing.

> [THE GOVERNMENT]: Okay.
>
> THE COURT: Because I understand if I say anything, the government is likely, on appeal, if they have an appeal, to argue again that I was prejudiced. So I'm going to do my very best to say as little as possible. Let me put that on the record.[11]
>
> But let me make as clear as I can, this case is going to be only about whether or not a jury finds that the three postings in January are—qualify as a threat. The jury's not going to hear about a grand conspiracy starting back in July—if that's the Government's intent, let me make as clear as I can, it's not going to come up in the opening. It's not going to—if it does come up in the opening, you will—I will deal with it then.
>
> The only thing we are going to get into in this case is the government establishing whether or not it meets the statute—whether the three statements meet the statute and are actual threats. That's what—not the planning stuff. Not all—none of the other stuff is going to come in. We're going to go through it one at a time, but that's not going to happen in this trial.

ROA.1056–57.

---

[11] In its brief, the Government cites the phrase "say as little as possible" to argue that the "district court deliberately avoided explaining its rulings to prevent the Government from arguing against those rulings on appellate review." Gov't Br. 40–41. But as these excerpts show, the district court minced no words and the basis for its rulings was clear and transparent.

The district court turned to the disputed trial exhibits and heard arguments about their admissibility. ROA.1060–1101.The court excluded exhibits outside of the threat framework derived from the *Burger* opinion, while admitting exhibits that were strictly relevant to the three statements charged in the indictment. ROA.1061–1101. Throughout the pretrial conference, the Government failed to identify any error in the district court's reading of the *Burger* opinion. ROA.1061–1101. The Government also never attempted to frame its proffer of evidence within the strict context the court laid out. ROA.1061–1101.

The debate over Government 24—cookies from Burger's iPhone—shows the district court's exercise of discretion under Rules 404(b) and 403. ROA.1093–98. The Government argued that because a cookie from Live Nations was left on Burger's iPhone on January 23—the same date as the statement in Count One[12]—it was relevant to connect Burger to the concert on April 12th.

[12] The statement in Count One did not mention a music event: "It will be months…Shawall…April…It will be a glorious wound…Upon their capital…And deal a grievous wound upon the followers of the cross…I cannot confirm anything aloud at the moment…But things are in motion…Don't delay yourselves too long brother, Jannah awaits us[.]" ROA.611.

ROA.1094. Burger replied this was "misleading and confusing" and that visiting the website of a company that controls ticketing for all music events was insufficient to connect Burger to a specific concert.[13] ROA.1094–95. Burger pointed out that it was the Government, not he, who came up with the April 12th concert. ROA.1095.

After giving the Government three opportunities to explain how the Live Nations cookie connected Burger to the concert, the Government failed to do so. ROA.1095–98. Nonetheless, the district court gave the Government a fourth try:

> THE COURT: But you—you're the ones who are putting that together. You have—right now, you have this that says Live Nation, then you have a statement about April 12th, and then your folks find the concert. I'm trying to—one more time and then I'll be done.
>
> What evidence do you have that the defendant was aware that there was a concert on April 12th?
>
> [THE GOVERNMENT]: Your Honor, we believe there's a reasonable inference to be drawn—

---

[13] The concert posting, Government 27, did not reference Live Nations. ROA.1490.

> THE COURT: You're repeating the same answer you've given. What evidence do you have of it? I clearly disagree that there is circumstantial—you can['t][14] just put all this Frankenstein together. I am—okay. I think I've asked it enough.
>
> I'm going to exclude 24.

ROA.1097–98; *see* ROA.1475–84 (Government 24).

Applying its reading of the *Burger* opinion, the district court excluded:

- Government 1B: Statements extracted from the Notes feature of Burger's iPhone, ROA.1061–62;
- Government 2: Statements on the keylogger made in Roblox[15] outside of the dates charged in the indictment, ROA.1064;
- Government 2A: Discord chat on January 23, 2025, between Burger as "Afrikan3r" and "Nusrullah," also known as "Xandersrange," ROA.1065–67, 1393–94;

---

[14] The transcript says "can" but in context it's clear that the Court said "can't."

[15] The keylogger did not identify the experience in Roblox where the keystrokes were made. ROA.1395.

- Government 5: Attribution sheet showing "Xandersrange" account on Roblox was owned by person in Saudi Arabia, ROA.1069, 1396–99;
- Government 5B: Attribution for "Nusrullah" (aka "Xandersrange") showing owner was person in Saudi Arabia, ROA.1069–70, 1400;
- Government 6: Series of four photos extracted from Burger's iPhone, ROA.1069–70, 1401–04;
- Government 7: Burger's Discord profile page, ROA.1071–72, 1405;
- Government 8: Picture of Islamic flag found in Burger's room, ROA.1072, 1406;
- Government 9: Cellebrite extraction report from Burger's iPhone showing 46 search terms out of 6,610 items searched, with no date attribution, ROA.1073, 1407–12;
- Government 10A: Keylogger entry dated seven months before charged statements, ROA.1074, 1413;
- Government 10B: Keylogger entry dated a week after the charged statements, ROA.1074, 1414;
- Government 10C: Keylogger entry dated a month before charged statements, ROA.1075, 1415;

- Government 11: Text of chat between "Crazz3pain" and "Megachel26" in Roblox a month before charged statements, ROA.1081–83, 1416–19;
- Government 15: Notes of bomb assembly seized from Burger when he was transferred from state into federal custody, ROA.1085, 1420–24;
- Government 15B: FBI lab report opining that notes described way to assemble an explosive device, ROA.1085, 1425;
- Government 16: Photo extracted from laptop, ROA.1086, 1431;
- Government 17: Discord chat on January 22, 2025, between "African3r" and "Mangar," ROA.1086–88, 1432–47;
- Government 18: Discord chat on July 24, 2025, seven months before charged statements, between "African3r" and "residueoffreedonginyourmouth," ROA.1089–90, 1448–49;
- Government 19: Discord chat from December 5, 2024, to January 23, 2025, between "Afrikan3r" and "bigas96," ROA.1091, 1450–68;

- Government 22: Discord chat between "African3r" and "peanutmeister69" after charged statements, ROA.1091–93, 1469–74;
- Government 23: Discord chat between "African3r" and "federalagent91" after charged statements, ROA.1093, 1472–73;
- Government 24: Cookies from Burger's iPhone, ROA.1093–98, 1475–84;
- Government 25: Discord chat between "African3r" and "ahmedaliboufaida" before charged statements, ROA.1098, 1485–87;
- Government 26: Telegram chat between "Abu Faizan" and "Hitler Lover" before charged statements, ROA.1099–1100, 1488–89;
- Government 27: Do512 website announcing Josiah Queen Concert, ROA.1052, 1059, 1490.

After making its evidentiary rulings, the district court ordered the special findings struck from the indictment. ROA.1105. The Government did not object to this order. ROA.1105. Two days later, the Government filed its notice of appeal and obtained a stay of the trial. ROA.704.

## SUMMARY OF THE ARGUMENTS

### I. The district court properly struck special findings from the indictment that were irrelevant, inflammatory, and prejudicial.

The district court properly struck from the indictment Special Findings to support a hate crime enhancement under the Sentencing Guidelines. The court did not abuse its discretion when it determined the Special Findings were irrelevant, inflammatory, and prejudicial to Burger's trial on charges that he made interstate threatening communications. The Special Findings risked creating jury confusion over the elements necessary for a conviction on the substantive threat charges. The Government remains able to submit the hate-crime enhancement to a jury without having it in the indictment.

### II. The district court did not clearly, much less plainly, abuse its discretion when it excluded the Government's proposed evidence under Rule 404(b).

The district court did not abuse its discretion when it followed the Court's guidance in the first appeal, *United States v. Burger*, 170 F.4th 395 (5th Cir. 2026) (per curiam), and strictly limited the trial evidence to the information within the Church experience that was known to the players who witnessed the charged statements.

The Government never challenged the district court's interpretation of *Burger* or offered its 404(b) evidence using the court's threat framework.

The district court also properly excluded the Government's plot evidence. The court acted within its discretion when it found that the plot was the Government's creation, not Burger's, and deemed that the Government failed to establish as a preliminary fact that Burger even knew about the claimed target.

Finally, the district court did not clearly abuse its discretion when it found that the probative value of the Government's 404(b) evidence was substantially outweighed by the unfair prejudice it posed to Burger's Sixth Amendment right to a fair trial and to his First Amendment right to free expression and association. The Government did not object that the district court failed to make an explicit on-the-record Rule 403 balancing.

## ARGUMENTS AND AUTHORITIES

### I. The district court properly struck special findings from the indictment that were irrelevant, inflammatory, and prejudicial.

Five months after the Government admitted in open court that it could not "definitively link" Burger to a Christian concert in Austin, it obtained a superseding indictment that included "Special Finding[s]" alleging a link between Burger and a plot to attack a Christian concert. The district court did not abuse its discretion when it found the Government's proffer was insufficient to allow a rational juror to connect Burger to the concert.

#### A. Standard of review.

The standard of review when a district court strikes surplusage from an indictment is for "abuse of discretion." *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993). But the Government did not make a contemporaneous objection before the district court when it ordered the Special Findings struck from the indictment. ROA.1104–05. Thus, "plain error" review applies. *Id.* at 1551; *see* Fed. R. Crim. P. 52(b). This involves four steps: 1) there must be an error or defect, 2) the legal error must be clear or obvious, 3) the error must have affected the appellant's substantial rights, and 4) if all of the above are satisfied, the appellate court "has the

*discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (cleaned up). The Government's arguments fail under either standard.

### B. The district court did not abuse its discretion, much less plainly, when it struck "Special Findings" from the indictment because they were irrelevant and prejudicial and risked misleading and confusing the jury about the elements necessary for a conviction.

Burger was charged with three counts of transmitting in interstate commerce threats "to injure the person of another[,]" in violation of 18 U.S.C. § 875(c), based on statements he made in the online gaming platform Roblox. ROA.66–68. The indictment alleged that the statements were "to attack a Christian concert," yet the statements set forth in the indictment that were alleged to be threats did not mention a "Christian concert." ROA.66–67.

On remand, the Government obtained a second superseding indictment adding "Special Finding[s]" to Counts One and Two alleging that Burger "intentionally selected a Christian concert as the object of his threat because of the actual and perceived religion of individuals associated with the Christian concert." ROA.611–12.

The cited authority for those findings was sentencing guideline §3A1.1, which directs the district court, at sentencing, to apply a three-level "hate crime" enhancement in the offense level calculation "[i]f the finder of fact at trial … determines beyond a reasonable doubt that the defendant intentionally selected any victim … as the object of the offense of conviction because of the actual or perceived … religion… of any person[.]" U.S.S.G. §3A1.1(a).

The district court did not abuse its discretion, much less plainly so, in striking the special findings from the indictment as surplusage. Federal Rule of Criminal Procedure 7(d) authorizes district courts to "strike surplusage from the indictment" "[u]pon the defendant's motion." Doing so is appropriate when surplus allegations "inflame the jury, confuse the issues, and blur the elements necessary for a conviction[.]" *See United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971) (providing examples of prejudicial allegations that should be struck from an indictment as surplusage). Trial courts must ensure that indictments do not contain surplusage that prejudices a defendant's right to a fair trial. *United States v. Poore*, 594 F.2d 39, 41 (4th Cir. 1979) (reversing district court for refusing to strike description of felon's prior conviction in felon in possession of firearm case).

Striking the special findings was appropriate here. Even though the jury must make the findings necessary to authorize the Guidelines enhancement, there is no requirement that the findings be alleged in the indictment because they do not affect the statutory range of punishment. And including those findings in Burger's indictment serves only to "inflame the jury, confuse the issues, and blur the elements necessary for a conviction," *Bullock*, 451 F.2d at 888, thus prejudicing his right to a fair trial, *Poore*, 594 F.2d at 41.

### 1. There is no requirement that the findings necessary for the Guidelines sentencing enhancement be alleged in the indictment.

The Special Findings are not elements of the offense and therefore unnecessary for the jury to decide at the guilt/innocence phase of the trial. Burger was charged with violating 18 U.S.C. §875(c), which makes it unlawful to transmit in interstate commerce a threatening communication. The statute is silent as to motivation. To obtain a guilty verdict, it makes no difference whether the threat was made because of the actual or perceived religion of the victim.

To qualify as an element, therefore, requires that the fact be proven to a jury to change the authorized sentence. *Alleyne v. United States*, 570 U.S. 99 (2013). In this case, proof of animus against Christians plays no role in altering the statutory range of

punishment. The Special Findings are therefore not necessary for a jury to determine guilt.

Moreover, the Government has an alternative means to submit the Guidelines enhancement to the jury without including it in the indictment. The jury could consider the enhancement in a bifurcated proceeding as the Supreme Court proposed in *Erlinger v. United States*, 602 U.S. 821 (2024).

Although *Erlinger* addressed the Armed Career Criminal Act, it provides useful guidance here. The Supreme Court recognized the danger of allowing a jury to consider prejudicial evidence when deciding guilt where highly prejudicial evidence may relate only to an enhanced penalty scheme. *Id.* at 847. *Erlinger* explained that bifurcation is a practical means of reducing the risk that jurors would be "overpersuaded" by the prejudicial evidence. *Id.*

Allowing the Government to present evidence relating to the Guideline enhancement if a jury has first determined guilt provides a reasonable alternative to admitting highly inflammatory and prejudicial evidence about animus against Christians during the guilt phase. *See also Spencer v. Texas,* 385 U.S. 554, 567 (1967) (discussing bifurcation to reduce risk impact from highly prejudicial

evidence). The Government's cited cases do not address the bifurcation alternative. *See* Gov't Br. 36–38.

### 2. The Special Findings risk confusing the jury about the elements and inflaming the jury against Burger.

At the pretrial conference, the district court was clear that it intended for the trial to be only about the "three postings" in January 2025 that were charged as crimes and whether the postings "qualify as a threat." ROA.1057. But the special findings would put Burger on trial for something else: a plot to attack a Christian concert. *See* ROA.666–85 ("Government Trial Brief Regarding 404(b) Evidence," listing twelve exhibits relevant to the special finding).

The Government argues that the district court failed to explain its reasons for striking the special findings and suggests "at a minimum" that the Court "should vacate the order" because of this failure. Gov't Br. 38. This ignores the court's concerns throughout the proceedings below that the Government was improperly using an uncharged plot to prove the statements were threats. ROA.962–964, 1054. The district court compared the effort to making a "Frankenstein" and made it clear that it was acting to prevent the Government from constructing the monster with the 404(b)

evidence. ROA.1098. The Government does not address these concerns in its brief here.

None of the cases the Government cites apply to a situation like this. *See* Gov't Br. 36–38. They do not involve indictments with irrelevant and prejudicial allegations that are also highly speculative and inflammatory and pose a substantial risk of confusing and misleading a jury. *See Graves*, 5 F.3d at 1550 (indictment's allegation that defendant was state official was true and relevant to motive); *United States v. Williams*, 445 F.3d 724, 734 (4th Cir. 2006) (evidence "compellingly tied" defendant to murder involving a firearm and he was on trial for possessing bullet that killed the victim); *United States v. Solomon*, 273 F.3d 1108, 2001 WL 1131955 (5th Cir. 2001) (per curiam) (unpublished) (allegation of defendant's prior conviction in fraud indictment was true and relevant to fraud); *Bullock*, 451 F.2d 884 (defendant's contention that conspiracy count contained unnecessary language failed to show language to be irrelevant, inflammatory and prejudicial); *United States v. Jiang*, No. 1:24-cr-65 (RDA), 2025 WL 419531 (E.D. Va. Feb. 6, 2025) (motive was relevant in prosecution of defendant who brought concealed firearm into Christian church during worship service). And *Jiang,* a district court decision, merely provides an example of a district

court exercising its discretion and not striking Special Findings from an indictment in a case where the defendant was also charged with hate crimes that contained motive as an element. *Id.*

The trial court did not abuse its discretion to prevent juror confusion by striking the special findings. The district court had no duty to keep allegations in an indictment that would serve to inflame the jury, confuse the issues, and blur the elements. To the contrary, the court had a duty to strike them and was correct to do so.

### C. Even if there was plain error, the Government cannot satisfy the remaining requirements for reversal: any error does not seriously affect the Government's substantial rights or adversely affect the fairness, integrity, or reputation of the proceedings because there is an alternative procedure available to provide notice to Burger and to secure the necessary jury findings.

By not lodging a contemporaneous objection when the district court ordered the Special Findings struck from the indictment, the Government has forfeited its claim that the district court abused its discretion. *See Puckett*, 556 U.S. at 133. Consequently, review is for plain error. *Id.*; Fed. R. Crim. P. 52(b).

If there was error, it had no ability to affect the Government's substantial rights or the fairness, integrity, or public reputation of the proceedings. The Government retained the ability to present the enhancement question to a jury through use of a special verdict form at a bifurcated trial. *See Erlinger,* 602 U.S. at 847 (addressing Armed Career Criminal Act and explaining that bifurcation is a practical means of reducing the risk that jurors will be "overpersuade[d] by prejudicial evidence"). This approach would provide Burger with fair notice that the enhancement is at play if the case proceeds to sentencing, avoid inflaming the jury and confusing it about the elements necessary for a conviction, and satisfy guideline §3A1.1's procedural requirement of a jury finding on a beyond a reasonable doubt standard.

## II. The district court did not clearly, much less plainly, abuse its discretion when it excluded the Government's proposed evidence under Rule 404(b).

### A. Standard of review.

The Court reviews a district court's exclusion of evidence for abuse of discretion. *United States v. Williams*, 30 F.4th 263, 266 (5th Cir. 2022). When evidence is admitted under Rule 404(b), review is heightened because "evidence in criminal trials must be *strictly relevant* to the particular offense charged." *United States v.*

*Gutierrez-Mendez*, 752 F.3d 418, 423 (5th Cir. 2014) (emphasis added) (citations omitted). "Trial court discretion is at its zenith" when it engages in Rule 403 balancing to exclude evidence. *Williams*, 30 F.4th at 266. Such rulings are disturbed only for a "clear abuse of discretion." *Id.* (citing *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007)). Unpreserved claims of error to rulings that exclude evidence are forfeited and reviewed for plain error. *See United States v. Seale,* 600 F.3d 473, 485 (5th Cir. 2010); Fed. R. Crim. P. 52(b).

### B. The district court did not clearly abuse its discretion when it excluded evidence of an uncharged plot to attack a Christian concert that it found to lack conditional relevance and deemed to be otherwise extrinsic, irrelevant, and unfairly prejudicial.

Rule 404(b) review "includes four different inquiries." *Gutierrez-Mendez,* 752 F.3d at 423.

First, where prior bad act evidence is "conditionally relevant," the Court determines whether "a jury was presented with sufficient evidence that the putative bad act actually occurred." *Id.* If not, then under Rule 104(b), the Court would find it would be error for the district court to have admitted it. *Id.* (citing *Huddleston v. United States*, 485 U.S. 681, 692 (1988)).

Second, if conditional relevance is met, the Court applies the two-part *Beechum* framework,[16] and asks whether the challenged evidence was relevant for any purpose other than proving the defendant's propensity to commit crimes. If yes, then the Court assesses whether the court abused its discretion under Rule 403 when it determined the unfair prejudice associated with the Rule 404(b) evidence did not substantially outweigh its probative value. *Gutierrez-Mendez*, 752 F.3d at 423.

#### 1. The Government's proposed evidence was extrinsic, not intrinsic.

The Government argues that the district court "legally erred in distinguishing between intrinsic and extrinsic evidence in critical ways," and submits its plot evidence was intrinsic and necessary to show that Burger was serious when he made the charged statements in the Church experience. Gov't Br. 41–43. The Government's argument fails to acknowledge the "leap" it makes to connect Burger to the Christian concert it theorized he was plotting to attack. Gov't Br. 41–48. It also fails to address that Burger's other

[16] *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

statements and activities never crossed the line from belief to crime.

Noncriminal conduct, by its very nature, is not intrinsic to, much less a part of, criminal conduct. *See United States v. Ridlehuber*, 11 F.3d 516 (5th Cir. 1993) (reversible error to introduce evidence of the existence of an unproven drug lab as "intrinsic" to defendant's possession of a short-barreled shotgun); *United States v. Sumlin*, 489 F.3d 683 (5th Cir. 2007) (reversible error to allow arresting officer to testify about unproven bad acts of transporting drugs as intrinsic to defendant's possession of firearm in vehicle); *Gutierrez-Mendez,* 752 F.3d at 426 (evidence that defendant was found with two illegal alien passengers during traffic stop two years prior to arrest for alien harboring crime, was insufficient to show earlier act was criminal and therefore testimony should have been excluded as lacking conditional relevance under Rule 104(b)); *United States v. Jimenez*, 613 F.2d 1373 (5th Cir. 1980) (evidence to show defendant knew of cocaine found in room was insufficient to prove knowing possession of cocaine and was therefore extrinsic to charged drug crime); *United States v. Brown*, 608 F.2d 551 (5th Cir. 1979) (evidence was insufficient to show defendant was responsible

for injuries suffered by child victim and extrinsic to injury to a child offense).

*Ridlehuber* and *Sumlin* best illustrate the point. In both cases, the prosecution presented evidence that suggested criminal activity without proof of it, asserting that it was "intrinsic" to the charged crime. In *Ridlehuber,* the evidence of illegal drug manufacturing was very weak. No drugs were found, although the residence smelled like a drug lab. *Ridlehuber,* 11 F.3d at 523. Two precursor chemicals necessary for manufacturing the drugs were not found. The only "criminal episode" proven was the charged possession of the sawed-shotgun—the rest, the *Ridlehuber* court deemed, was "conjecture." *Id.* at 522. Consequently, the drug lab evidence was extrinsic. In *Sumlin,* the arresting officer said he suspected that the defendant was transporting narcotics because the body of the car had several loose screws, he found a suspected marijuana cigarette, and a dog alerted to the vehicle, although no drugs were found. *Sumlin,* 489 F.3d at 686–88. This evidence failed to prove the defendant was transporting drugs. *Id.* at 690. The only "criminal episode" shown was the possession of a firearm; the rest, the *Sumlin* court held, was "conjecture and irrelevant. *Id.*

In this case, the claimed plot was the Government's own conjecture. The Government never linked Burger to a Christian concert, much less showed that he was taking steps to attack one. The Government claimed that it should be permitted to argue to the jury that a "reasonable inference" existed because Burger's phone contained a "cookie"[17] showing that he had visited the website of Live Nations. ROA.1051–52, 1094–98. The cookie did not identify any music event Burger may have seen there. Burger's statements in the Church experience stood on their own. The plot was the Government's making. The district court did not clearly abuse its powers in excluding this evidence.

The Government's cited authorities on intrinsic v. extrinsic evidence fail. Those authorities involve a common "intrinsic" situation where uncharged criminal acts are part of a larger pattern of charged criminal conduct. *See United States v. Gurrola*, 898 F.3d 524 (5th Cir. 2018) (murder for hire plot intrinsic to sexual assault prosecution which motivated the killing of a material witness to the

[17] A "cookie" is a small file or part of a file stored on an internet user's computer, created and subsequently read by a website server, and containing information that can include a record of pages visited. *Cookie,* Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/cookie (last visited Nov. 9, 2026).

sexual assault); *United States v. Beeman*, 135 F.4th 139 (4th Cir.), *cert. denied,* 146 S. Ct. 246 (2025) (threats contained in earlier letter mailed by defendant to victim was intrinsic to subsequent letter containing threat as it completed the story of earlier threat); *United States v. Censke*, 449 F. App'x 456, 467 (6th Cir. 2011) (earlier voice mail and letter threats to lawyer representing rehab facility that had issued criminal trespass warning to defendant were intrinsic and "helped complete the story" of later threatening letter); *United States v. Springer*, 753 F. App'x 821, 828 (11th Cir. 2018) (defendant inmate made threats to kill a federal judge in presence of other inmates to whom he said at the time that he was follower of ISIS; this allowed introduction of images from defendant's phone of sympathy for ISIS and martyrdom to show seriousness of statement).

In sum, Rule 404(b)'s strict admissibility standards exclude the extrinsic plot evidence. The district court did not clearly, much less plainly, abuse its discretion when it found that a date alone was insufficient to connect Burger to a Christian concert in Austin, Texas.

**2. The district court did not abuse its discretion when it found that the Government had failed to establish a necessary preliminary fact to establish conditional relevance: that Burger had knowledge of the Christian concert it claimed he was plotting to attack.**

In *Huddleston v. United States*, 485 U.S. 681 (1988), the Supreme Court held that 404(b) bad-act evidence is subject to Rule 104(b) on conditional relevance. Under Rule 104(b), evidence is admissible only if there is sufficient evidence to support a finding that the alleged conduct occurred. *Id.* The "court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact … by a preponderance of the evidence." *Id.* at 690. "The trial court has traditionally exercised the broadest sort of discretion … in controlling the order of proof at trial…." *Id.* The nonfinal nature of pre-trial rulings in further impede appellate review as evidentiary rulings often depend upon the "broader evidentiary canvas of a case" that a trial will allow. *Williams,* 30 F.4th at 265.

The Government told the district court that a cookie from Live Nations in Burger's iPhone connected him to a Josiah Queen concert scheduled for April 12, 2025, in Austin, Texas. ROA.1052. Under repeated questioning by the district court at the pretrial

hearing, the Government was unable to explain how a mere cookie from a worldwide music promotor could support such an inference. ROA.1052, 1095–99.

As *Huddleston* observes, district courts act with their "broadest discretion" when they "control the order of proof" at trial. *Id.* at 690. After examining the evidence in the case, the district court ruled. *Huddleston*, 485 U.S. at 690. This included the Government's proffer regarding data extracted from Burger's laptop and iPhone (which included Burger's search history, the contents of chats on Discord and Telegram) and material seized from Burger's home. ROA.1052.

Under *Huddleston,* the district court had the discretion to conclude that a jury could not "reasonably find the conditional fact" that Burger was aware of the Josiah Queen concert "by a preponderance of the evidence." *Id.* at 690. In *Sumlin, Ridlehuber, and Gutierrez-Mendez, supra,* this Court held that conditional relevancy under Rule 104(b) was not met. For the same reasons, it is lacking here. Rule 404(b) "prevents the government from bootstrapping its evidence into this case." *Ridlehuber,* 11 F.3d at 524.

### 3. The district court did not clearly abuse its discretion when it excluded the extrinsic plot evidence and strictly limited the Government's evidence to that which was relevant to assessing the statements Burger made in the Church experience.

The next step under *Beechum* asks "whether the challenged evidence was relevant for any purpose other than proving the defendant's propensity to commit crimes." *Gutierrez-Mendez*, 752 F.3d at 423. Here, the answer is "no." The plot evidence served only one purpose: to prove that Burger was a terrorist, and as such, that Burger had the propensity to commit acts of terror.[18]

Before trial, the Government never provided the district court with a propensity-free purpose for its exhibits. In its two pretrial 404(b) notices, the Government argued its exhibits were either "intrinsic" to the charged threats, or admissible for every 404(b) purpose. ROA.353–56, 666–84. The Government's failure to identify a specific permissible 404(b) purpose, and to articulate how the exhibit satisfied the purpose, speaks for itself.

---

[18] In pretrial filings, the Government conceded this. In its Amended 404(b) Notice, it argued that the proposed plot evidence was relevant to show "knowledge, opportunity, intent, preparation, plan, identity, absence of mistake, or accident, *and predisposition to commit the charged crimes."* (emphasis added). ROA.355.

The Government urged the admissibility of its 404(b) evidence in terms of propensity. It argued that the 404(b) evidence showed "[Burger's] planning, going back to July 24, where he swears his loyalty to the head of Isis and talks about wanting to kill police. All the way to up through when he actually finishes his plans, picks his date, makes his threats, and then talk about after …." ROA.1056. Burger was guilty of making terroristic threats, the Government argued, because he was, in fact, a terrorist. The district court saw the Government's proffer for what it was—impermissible propensity evidence—and did not clearly abuse its discretion when it excluded it.

The district court did not misunderstand the law of true threats when it limited the threat framework to the Church experience. The district court found that the intent before the jury was whether Burger recklessly disregarded the risk that his statements would be taken seriously by other players within the context of the Church experience. *Burger,* 170 4th at 405. To this end, the testimony of the tipsters was relevant to assess both Burger's intent and to assess how an "objectively reasonable" player would interpret the statements. *Id.* The Government's proffer disregarded the strict context from which a jury was to examine the statements.

The district court also did not misunderstand Rule 404(b) when it required the Government's trial exhibits to be strictly relevant to proving whether the three statements charged in the indictment were true threats. All exhibits the district court excluded failed to meet these rigid admissibility requirements and exposed Burger to being found guilty because of religious beliefs and online associations, not actions.

These rulings also fit the district court's mandate as a trial court to put Burger on trial for the offense the Government has charged him with, which requires the jury to determine only whether the three statements charged in the indictment are true threats. *See* ROA.1057 (district court explaining that Government would be limited to presenting evidence probative of the threats alleged in the indictment, not the claimed plot).

4. **The district court did not clearly abuse its Rule 403 discretion when it refused to let the Government put its "Frankenstein" together and excluded from trial evidence of a plot to attack a Christian concert that the Government was unable to show Burger even knew about, and which if presented, poses the risk of confusing and misleading the jury.**

Courts undertake the last step of the *Beechum* analysis only if the challenged evidence meets the strict relevance standard of

404(b). *Beechum,* 582 F.2d at 911. The rule allows district courts to exclude relevant evidence from trial if its probative weight is substantially outweighed by the risk of unfair prejudice. *Id.*; *see* Fed. R. Evid. 403.

The Government contends the district court "never stated that it was excluding the challenged exhibits as more prejudicial than probative" under Rule 403. Gov't Br. 49. The Government ignores the district court's worry that many of its challenged exhibits risked creating a "Frankenstein" monster of a case. ROA.1098.

The Frankenstein reference shows the district court's Rule 403 concerns about the Government's 404(b) evidence. The court was firm about not allowing the Government to launch a fear-based narrative. Yet the Government suggests that the district court never made its 403 concerns known to the parties. Gov't Br. 49–50. The record does not support this claim. The court was clear during the pretrial conference that the purpose of the trial was for the jury to determine if Burger's statements in the Church experience were true threats. ROA.1057. Burger would not be put on trial for anything else. ROA.1057. The court's careful evidentiary rulings served this purpose.

Before ruling on each exhibit, the district court heard from the parties. It either found the exhibit was irrelevant or determined that its probative weight was substantially outweighed by its potential for unfair prejudice. ROA.1061–1102. The Government did not object that the court failed to conduct an explicit on-the-record 403 balancing. *See* ROA.1061–1102. Nor did the Government offer a 403 balancing of its own to show the court it was wrong. *See* ROA.1061–1102. The Government therefore failed to preserve any error on this aspect of the court's rulings. *See* Fed. R. Crim. P. 51(b) ("A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.").

In the end, the Government and the district court could not agree on what crime Burger was to be tried for. The court found that, based on the allegations in the indictment, Burger would be on trial only for the statements he made in the Church experience. The Government wants to try Burger for plotting to attack a Josiah Queen concert. The district court did not clearly abuse its discretion by limiting the Government's proof to the crime charged in the indictment.

The district court also acted properly to prevent the Government from using the 404(b) evidence to criminalize Burger's chats and activities across different online platforms that implicated his beliefs, inclinations and fantasies. *See Jacobson v. United States,* 503 U.S. 540, 551–52 (1992) (a person's inclinations and fantasies are his own and beyond the reach of the Government). The Government does not have the power to punish us for our thoughts and not our actions. *Stanley v. Georgia,* 394 U.S. 557, 565 (1969) (First Amendment prohibits making private possession of obscene material a crime). Fantasizing about committing a crime, even one that involves an act of violence, is not a crime. *United States v. Valle,* 807 F.3d 508, 511 (2nd Cir. 2015) (evidence insufficient to convict defendant of conspiracy to kidnap where internet chats involved fantasy related to sexual fetish). Moreover, admitting evidence of "nothing more than [a defendant's] abstract beliefs" also violates the First Amendment when not relevant to a disputed issue. *Dawson v. Delaware,* 503 U.S. 159, 165–67 (1992) (error to admit stipulation regarding Aryan brotherhood membership). The Government never showed that Burger's other online chats or activities crossed the line of imminent criminal conduct as was needed for it to lose First Amendment protection. *Ashcroft v. Free Speech Coalition*, 535

U.S. 234 (2002) (ban on virtual child pornography violated First Amendment).

### C. Even if there was obvious error, the Government has failed to meet the difficult burden of meeting prongs three and four.

All four prongs of plain error review must be met before the Court may exercise discretion and take the corrective action the Government seeks. *Puckett,* 556 U.S. at 135. It has fallen short of meeting prong one, as it cannot show any error or defect in the trial court's evidentiary rulings. It also fails to meet prong two, which requires clear and obvious legal error.

The third prong requires that the Government show that the court's evidentiary rulings affected its "substantial rights." This has been interpreted to mean that the rulings adversely affected the outcome of the proceedings. *Puckett*, 556 U.S. at 135. The Government cannot satisfy this prong because the trial has yet to occur. As to the fourth prong, which depends upon the satisfaction of the above three prongs, the Government must show the Court that it should use its discretion to remedy the claimed errors; because otherwise, the "fairness, integrity or public reputation of the judicial proceedings" will be called into question. *Id.* No scenario exists

under which the Court could find that the Government has met this last and final prong.

## CONCLUSION

This Court should affirm the district court's order striking the Special Findings from the indictment, affirm the district court's evidentiary rulings, and remand for further proceedings.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Jose Gonzalez-Falla
JOSE GONZALEZ-FALLA
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,967 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Jose Gonzalez-Falla
JOSE GONZALEZ-FALLA
*Attorney for Defendant-Appellant*
Dated: November 10, 2026